UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
XINGYAN CAO; HE HE; BOZHENG JIA; YUE JIN;
YING LI; YITING SU; HAOYI XIE; JUNWU YAO;
RONG HUA ZHENG; XINGWEI ZHU; JIA SI;
JUNCHEN CHEN,

                        Plaintiffs,

         v.

FLUSHING PARIS WEDDING LLC D/B/A PARIS
WEDDING CENTER; LAFFECTION WEDDING LLC
D/B/A LAFFECTION WEDDING; PARIS WEDDING
CENTER CORP. D/B/A PARIS WEDDING CENTER;
ROMANTIC PARIS LLC D/B/A ROMANTIC PARIS
WEDDING; WEDDING IN PARIS LLC D/B/A
WEDDING IN PARIS, MAX HUANG; SAU W. LAM;
FIONA RUIHUA YANG; ABC CORP. D/B/A MAX
PHOTO NY D/B/A MAXHUANG STUDIO; MAX
WEDDING NY INC.; MAX WEDDING BK INC,

                       Defendants.
------------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

20-CV-2336
(Kovner, J.)
(Marutollo, M.J.)

**JOSEPH A. MARUTOLLO, United States Magistrate Judge:**

       Plaintiffs Xingyan Cao, Junchen Chen, He He, Bozheng Jia, Yue Jin, Ying Li, Jia Si, Yiting

Su, Haoyi Xie, Junwu Yao, Rong Hua Zheng, and Xingwei Zhu commenced this action against a

group of wedding photography businesses and their alleged owners and operators for violations of

the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq., and New York Labor Law

("NYLL"), §§ 650 et seq.  *See* Dkt. No. 1 (Complaint); Dkt No. 8 (Amended Complaint).

Defendants Flushing Paris Wedding LLC d/b/a Paris Wedding Center ("Flushing Paris Wedding"),

Paris Wedding Center Corp. d/b/a Paris Wedding Center ("Paris Wedding Center"), Laffection

Wedding LLC d/b/a Laffection Wedding ("Laffection Wedding"), Romantic Paris LLC d/b/a

Romantic Paris Wedding ("Romantic Paris Wedding"), and Wedding in Paris LLC d/b/a Wedding

in Paris ("Wedding in Paris") (collectively, "Defaulting Defendants") did not appear in this action or otherwise respond to Plaintiffs' claims.[1]

Currently pending before this Court, on a referral from the Honorable Rachel P. Kovner, United States District Judge, is Plaintiffs' motion for default judgment against the Defaulting Defendants. *See* Dkt. No. 82; *see also* May 8, 2023 Referral Order.[2]  For the reasons set forth below, this Court respectfully recommends that Plaintiffs' motion for default judgment be granted in part and denied in part.[3]

## BACKGROUND

### I.    Factual Allegations

The following facts are taken from the Amended Complaint, Plaintiffs' motion, and the attachments filed in support of Plaintiffs' motion; the facts are assumed to be true for the purposes of this motion. *See Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009) (in light of defendant's default, a court is required to accept all of plaintiff's factual allegations as true and draw all reasonable inferences in its favor).

### A.    Defaulting Defendants

Defaulting Defendants operated a chain of wedding photography businesses located throughout New York City. *See* Dkt. No. 8 ¶ 1.  Their principal places of business are as follows:

- ▪ Flushing Paris Wedding: 42-55 Main Street, Flushing, New York 11355 (*id.* ¶ 34)

---

[1] As explained in Section I(C) *infra*, Plaintiff Cao and Defendants Max Huang, Sau W. Lam, Fiona Ruihua Yang, Max Wedding NY Inc. d/b/a Paris Wedding Center, Max Wedding BK Inc d/b/a Paris Wedding Brooklyn, and ABC Corp. d/b/a Max Photo NY d/b/a Maxhuang Studio were dismissed from this case.

[2] The referral was made to then-United States Magistrate Judge Ramon E. Reyes, Jr.  Upon Judge Reyes's appointment as a United States District Judge, the matter was re-assigned to the undersigned. *See* Nov. 9, 2023 Dkt. Entry.

[3] The Court's damages calculations are set forth in the appendix to this Report and Recommendation ("Appendix A").

- Paris Wedding Center: 42-55 Main Street, Flushing, New York 11355 (*id.* ¶ 40)

- Laffection Wedding: 35-56 Main Street, Flushing, New York 11356 (*id.* ¶ 37)

- Wedding in Paris: 4711 8th Avenue, Units 1A, 1B, Brooklyn, New York 11220 (*id.* ¶ 46)

- Romantic Paris: 35 East Broadway, 1st Floor, New York, New York 10002 (*id.* ¶ 43)

Individual Defendants Huang, Lam, and Yang owned, managed, and operated the above stores. *Id.* ¶ 60. Collectively, Defendants regularly employed twenty to twenty-five employees, engaged in interstate commerce, and had annual gross sales volumes that exceed $500,000. *See id.* ¶¶ 35, 38, 44, 47; *see, e.g.*, Dkt. No. 83-3 ¶ 16; Dkt. No. 83-4 ¶ 16.

In March 2020, Defaulting Defendants ceased operations and closed their stores due to the COVID-19 pandemic. *See* Dkt. No. 8 ¶ 91. Shortly thereafter, Defendant Huang purchased the Defaulting Defendant entities. *See id.* ¶ 221. Huang opened Max Wedding NY at the same location where Flushing Paris Wedding and Paris Wedding Center had operated, and he opened Max Wedding BK where Wedding in Paris had operated. *Id.* ¶¶ 93-94. Huang's entities performed the same wedding services as Defaulting Defendants. *Id.* ¶¶ 94-95.

### B.    Plaintiffs

Plaintiffs were all formerly employed by Defaulting Defendants in various non-managerial, non-supervisory roles. *Id.* ¶¶ 9–32. Each Plaintiff's respective dates of employment, position(s) held, location(s) worked, weekly hours, and payrates are set forth below.[4]

---

[4] Where there are discrepancies between factual allegations in the Amended Complaint and the signed declarations and affidavits of Plaintiffs, the undersigned has relied on the facts in the affidavits and declarations to resolve liability and calculate damages. *See, e.g., Chen v. Oceanica Chinese Rest., Inc.*, No. 13-CV-4623 (NGG) (PK), 2023 WL 2583856, at *2 (E.D.N.Y. Mar. 21, 2023) (crediting factual allegations in plaintiffs' affirmations over allegations in second amended complaint); *Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 29 (E.D.N.Y. 2015) ("A court may rely on detailed affidavits and documentary evidence, in addition to the plaintiff's complaint, to determine the sufficiency of a default judgment claim." (cleaned up)). Plaintiffs' affidavits and declarations are "presumed to be correct in the absence of any rebuttal evidence proffered by Defendants." *Duro v. BZR Piping & Heating Inc.*, No. 10-

1.    **Plaintiff Junchen Chen**

Plaintiff Chen is a resident of Nassau County[5] and was employed by Defaulting Defendants as a photographer from September 2014 to March 14, 2020.  *See* Dkt. No. 8 ¶¶ 31-32, 198.  Chen was hired to work at Defaulting Defendants' various store locations.  *See* Dkt. No. 83-12 ¶ 3.

Throughout his employment, Chen worked six to seven days per week without set days of rest.  *Id.* ¶ 4.  Defaulting Defendants paid Chen a fixed monthly rate, and he was not compensated for the hours he worked in excess of forty hours each workweek.  *Id.* ¶¶ 9-10.  When he was assigned to work at Defaulting Defendants' stores, he would typically work from 10:00 a.m. or 11:00 a.m. to around 8:00 p.m.  *Id.*  When he was scheduled to work at clients' weddings, his schedule was predominantly from 12:00 p.m. to 10:00 p.m., but on some days, he worked from 7:00 a.m. to 5:00 p.m. or 12:00 p.m. to 12:00 a.m.  *Id.*  After each shift, Chen had to spend time at home retouching his photos, which often took him an additional three hours.  *Id.*  He did not use a time tracking device to record his hours.  *Id.* ¶ 8.

From 2014 through 2016, Chen worked an average of sixty hours per week and was paid $1,400.00 per month.[6]  *Id.* ¶¶ 4-9.  From 2017 through March 14, 2020, Chen's last day of

CV-0879 (ARR) (ALC), 2011 WL 710449, at *3 (E.D.N.Y. Jan. 26, 2011), *report and recommendation adopted*, 2011 WL 744156 (E.D.N.Y. Feb. 22, 2011).

[5] Paragraph 31 of the Amended Complaint states that Chen is a resident of Queens.  *See* Dkt. No. 8 ¶ 31. However, Chen's declaration states that he is a resident of Nassau County.  *See* Dkt. No. 83-12 ¶ 1. The undersigned credits Chen's declaration. *Rilloraza v. Rhodes*, No. 21-CV-3305 (PKC) (JRC), 2023 WL 7686699, at *fn. 1 (E.D.N.Y. Sept. 8, 2023) ("Where the affidavit deviates from the allegations set forth in the Amended Complaint and Memorandum in Support of Motion for Default Judgment, this Court relies on the facts stated in plaintiff's detailed affidavit.") (collecting cases).

[6] The Amended Complaint and affidavits submitted in support of Plaintiffs' motion do not indicate the average hours worked per week, though the affidavits do set forth the hours of the shifts in which each plaintiff typically worked.  Because the number of weekly hours each Plaintiff worked is material to Plaintiffs' claims and damages calculations, the Court also relies on Plaintiffs' damages spreadsheet, which identifies the number of hours each plaintiff worked during the relevant period.  *See Zabrodin v. Silk 222, Inc.*, No. 22-CV-7064 (KAM) (MMH), 2023 WL 8009319, at *1, fn.1 (E.D.N.Y. Nov. 20, 2023) (relying on Plaintiffs' damages spreadsheet for purposes of determining days worked); *Mercedes v. Tito*

employment, he worked an average of fifty-five hours per week and was paid $2,900.00 per month. *Id.*

According to Chen's recollection,[7] he worked the following average weekly hours and received the following monthly wages:[8]

| Dates Worked | Weekly Hours | Monthly Wages |
|---|---|---|
| September 1, 2014 – December 31, 2016 | 60 | $1,400.00 |
| January 1, 2017 – December 31, 2017 | 55 | $2,000.00 |
| January 1, 2018 – November 30, 2019 | 55 | $2,900.00 |
| December 1, 2019 – March 14, 2020 | 55 | $3,200.00 |

When Chen was hired, Defaulting Defendants did not provide him with a wage notice in English or in Chinese, which is his primary language. Dkt. No. 83-12 ¶ 12. Defaulting Defendants also failed to provide Chen with a wage statement with each monthly payment. *Id.* ¶ 13.

### 2.    Plaintiff He He

Plaintiff He is a resident of Queens County[9] and was employed by Defendants to work as a bookkeeper at Paris Wedding Center from September 2012 to March 31, 2020. Dkt. No. 8 ¶ 12; Dkt. No. 83-2 ¶¶ 1, 3. From approximately September 2012 to October 2016, He regularly worked seven days a week without set days of rest – often from 10:00 a.m. to 2:30 p.m. on Monday through Friday and from 10:00 a.m. to 8:00 p.m. on Saturday and Sunday. Dkt. No. 83-2 ¶ 4. During this time, He was paid $10 per hour for all hours worked. *Id.* ¶ 6.

---

*Transmission Corp.*, No. 15-CV-1170 (CM) (DF), 2019 WL 102007, at *10 (S.D.N.Y. Jan. 4, 2019) (explaining how the court "largely relied" on plaintiffs' proposed damages spreadsheet)

[7] *See* Dkt. No. 83-12 ¶¶ 5, 6, 9; *see also* Dkt. No. 83-15, at 103-07.

[8] The Court notes that the columns in the charts set forth in this Report and Recommendation vary based on the facts alleged by Plaintiffs.

[9] According to the Amended Complaint, He is a resident of Nassau County (Dkt. No. 8 ¶ 12), but in her affidavit, He states that she is a resident of Queens (Dkt. No. 83-2 ¶ 1).

In November 2016 through March 31, 2020, He worked mostly from home and averaged about forty hours per week. *Id.* ¶ 4. In months where she had to file Defaulting Defendants' sales taxes—February, March, June, September, and December—He would work around sixty hours per week, often seven days per week. *Id.*

Defaulting Defendants paid He a fixed monthly wage regardless of the number of hours that she worked. *Id.* ¶ 6. She was not compensated for any of the hours that she worked in excess of forty each workweek. *Id.* ¶ 7. He's starting pay was $2,800.00 per month, and in May 2017, it increased to $3,500.00 per month. *Id.* ¶ 6.

According to He's recollection,[10] she worked the following average weekly hours and received the following wages:

| Dates Worked | Weekly Hours | Wage |
|---|---|---|
| September 2012 – October 31, 2016 | 42.5 | $10/hour |
| November 1, 2016 – April 30, 2017 | 60 | $2,800/month |
| May 1, 2017 – March 31, 2020 | 60 | $3,500/month |

When He was hired, Defaulting Defendants did not provide her with a wage notice in English or in Chinese, which is He's primary language. Dkt. No. 83-2 ¶ 8. Defaulting Defendants also failed to provide He with a wage statement with each wage payment. *Id.* ¶ 9.

### 3. Plaintiff Bozheng Jia

Plaintiff Jia is a resident of Nassau County and was employed by Defendants as a part-time photographer from June 2015 through March 2020. *See* Dkt. No. 8 ¶¶ 13-14.

For most of his employment, Jia regularly worked three to five days per week without set days of rest. *See* Dkt. No. 83-3 ¶ 4. During peak wedding business season ("Peak Season"), which runs in May, June, September, and October, Jia worked a five-hour shift one to two days per week,

---

[10] *See* Dkt. No. 83-2 ¶¶ 4, 6; *see also* Dkt. No. 83-15, at 7-12.

a ten-hour shift two to three days per week, and a twelve-hour shift one day per week.  Dkt. No. 83-3 ¶ 6.  During non-peak wedding business season ("Non-Peak Season"), Jia worked a five-hour shift one to two days per week, a ten-hour shift one to two days per week, and a twelve-hour shift once per two weeks.  *Id.* ¶ 7.  Jia also worked an additional two hours after every five-hour wedding, four to five hours after every ten-hour wedding, and five to six hours after every twelve-hour wedding to retouch his photographs.  Dkt. No. 8 ¶ 120; Dkt. No. 83-3 ¶ 8.  Jia did not use a time tracking device to record the hours that he worked.  Dkt. No. 83-3 ¶ 9.

Jia was paid on a per-event basis: $100 for five-hour weddings and $200 for ten- and twelve-hour weddings.  Dkt. No. 8 ¶¶ 119, 122; Dkt. No. 83-3 ¶ 10.  He was not paid for the hours that he worked in excess of forty hours each workweek.  Dkt. No. 8 ¶ 123; Dkt. No. 83-3 ¶ 11.

According to Jia's recollection,[11] he worked the following average weekly hours and received the following wages:

| Dates Worked | Weekly Hours | Weekly Wages |
| --- | --- | --- |
| June 1, 2015 - August 31, 2015 | 47 | $600.00 |
| September 1, 2015 - October 31, 2015 | 62 | $800.00 |
| November 1, 2015 - April 30, 2016 | 47 | $600.00 |
| May 1, 2016 - June 30, 2016 | 62 | $800.00 |
| July 1, 2016 - August 31, 2016 | 47 | $600.00 |
| September 1, 2016 - October 31, 2016 | 62 | $800.00 |
| November 1, 2016 - April 30, 2017 | 47 | $600.00 |
| May 1, 2017 - June 30, 2017 | 62 | $800.00 |
| July 1, 2017 - August 31, 2017 | 47 | $600.00 |
| September 1, 2017 - October 31, 2017 | 62 | $800.00 |
| November 1, 2017 – April 30, 2018 | 47 | $600.00 |
| May 1, 2017 - June 30, 2018 | 62 | $800.00 |
| July 1, 2017 - August 31, 2018 | 47 | $600.00 |
| September 1, 2018 - October 31, 2018 | 62 | $800.00 |
| November 1, 2018 - April 30, 2019 | 47 | $600.00 |
| May 1, 2019 - June 30, 2019 | 62 | $800.00 |
| July 1, 2019 - August 31, 2019 | 47 | $600.00 |
| September 1, 2019 - October 31, 2019 | 62 | $800.00 |
| November 1, 2019 - March 1, 2020 | 47 | $600.00 |

---

[11] *See* Dkt. No. 83-3 ¶¶ 4-7, 10; *see also* Dkt. No. 83-15, at 12-26.

When Jia was hired, Defaulting Defendants did not provide him with a wage notice in English or in Chinese, which is Jia's primary language. Dkt. No. 83-3 ¶ 12. Defaulting Defendants also failed to provide Jia with a wage statement with each monthly wage payment. *Id.* ¶ 13.

### 4. Plaintiff Yue Jin

Plaintiff Jin is a resident of Queens and was employed by Defendants as a receptionist and makeup artist from May 2015 to March 4, 2020. Dkt. No. 8 ¶¶ 16, 127; Dkt. No. 83-4 ¶¶ 1, 3. Jin worked at Laffection Wedding until it closed in February 2019 and then worked at Paris Wedding Center. Dkt. No. 83-4 ¶ 3.

Throughout her employment, Jin regularly worked six days a week without set days of rest. *Id.* ¶ 4. On average, Jin worked sixty-four to seventy-four hours a week. *Id.* ¶¶ 5-7. When she would work at the store, her hours were from 10:00 a.m. to around 7:00 p.m. or 8:00 p.m. *Id.* On the days she was required to work at clients' weddings, Jin would work from around 8:00 a.m. to 10:00 p.m. or midnight. *Id.* Jin punched in and out when she worked at Laffection Wedding and Paris Wedding Center, but she did not use any time tracking device to record the hours that she worked at clients' weddings. *Id.* ¶ 8.

Jin's rate of pay varied based on whether she was working at the store or clients' weddings. For the former, Jin was paid on an hourly basis, beginning at $7.00 per hour in May 2015 and ending at $9.00 per hour in March 2020. *Id.* ¶ 9. When she worked at clients' weddings, Jin was paid on a per-event basis: $105.00 for a half-day schedule, $200.00 for a full day schedule, and $305.00 for a full day and night schedule. *Id.* ¶ 10. Jin also received a 3% or 5% commission for every client who purchased a photo service. *Id.* Jin was not paid for the hours that she worked in excess of forty hours each workweek. *Id.* ¶ 11.

According to Jin's recollection,[12] she worked the following average weekly hours and received the following weekly wages:

| Dates Worked | Weekly Hours | Weekly Wages |
|---|---|---|
| June 1, 2015 - June 30, 2015 | 64 | $525.00 |
| July 1, 2015 - August 30, 2015 | 64 | $540.00 |
| September 1, 2015 - October 31, 2015 | 74 | $480.00 |
| November 1, 2015 - April 30, 2016 | 64 | $540.00 |
| May 1, 2016 - June 30, 2016 | 74 | $480.00 |
| July 1, 2016 - August 31, 2016 | 64 | $540.00 |
| September 1, 2016 - October 31, 2016 | 74 | $480.00 |
| November 1, 2016 - April 30, 2017 | 64 | $540.00 |
| May 1, 2017 - June 30, 2017 | 74 | $480.00 |
| July 1, 2017 - August 31, 2017 | 64 | $540.00 |
| September 1, 2017 - October 31, 2017 | 74 | $480.00 |
| November 1, 2017 - April 30, 2018 | 64 | $540.00 |
| May 1, 2018 - June 30, 2018 | 74 | $480.00 |
| July 1, 2018 - August 31, 2018 | 64 | $540.00 |
| September 1, 2018 - October 31, 2018 | 74 | $480.00 |
| November 1, 2018 - December 30, 2018 | 64 | $555.00 |
| December 31, 2018 - April 30, 2019 | 64 | $585.00 |
| May 1, 2019 - June 30, 2019 | 74 | $555.00 |
| July 1, 2019 - August 31, 2019 | 64 | $585.00 |
| September 1, 2019 - October 31, 2019 | 74 | $555.00 |
| November 1, 2019 - March 1, 2020 | 64 | $585.00 |

When Jin was hired, Defaulting Defendants did not provide her with a wage notice in English or in Chinese, which is her primary language.  Dkt. No. 8 ¶ 133; Dkt. No. 83-4 ¶ 12.  Defaulting Defendants also failed to provide Jin with a wage statement with each wage payment.  Dkt. No. 8 ¶ 134; Dkt. No. 83-4 ¶ 13.

**5.    Plaintiff Ying Li**

Plaintiff Li is a resident of Nassau County and was employed by Defaulting Defendants as a makeup artist from March 2011 to July 2013.  Dkt. No. 8 ¶¶ 17-18; Dkt. No. 83-5 ¶ 3.  In July 2013, Li quit her job, but in summer 2017, she resumed her employment.  Dkt. No. 8 ¶¶ 18, 135.

[12] *See* Dkt. No. 83-4 ¶¶ 4-10; Dkt. No. 83-15, at 26-40.

9

Li worked primarily at Wedding in Paris, but she occasionally worked at Paris Wedding Center too.  *Id.*  ¶ 135.

For the majority of her employment, Li worked six to seven days per week.  Dkt. No. 8 ¶ 136; Dkt. No. 83-5 ¶ 4.  When working in-store, her hours were from 10:00 a.m. to 6:00 p.m. or 7:00 p.m. Dkt. No. 83-5 ¶ 6.  During Peak Season, Li worked weddings five to six days per week, including twelve-hour weddings three to four days per week, and she did not have a fixed schedule for the remaining two to three days.  *Id*.  During Non-Peak Season, Li worked ten-hour weddings two days per week and twelve-hour weddings one to two days per week, and she did not have a fixed schedule for the remaining three to four days.  *Id.* ¶ 7.  Li punched in and out when she worked at Defaulting Defendants' stores, but she did not use a time tracking device when she worked at clients' weddings  *Id.* ¶ 8.

Defaulting Defendants paid Li an hourly rate of $11.00 when she worked in-store and a flat-rate when she worked at weddings, consisting of $105.00 for five-hour weddings, $200.00 for ten-hour weddings, and $305.00 for twelve-hour weddings.  Dkt. No. 8 ¶¶ 135–36, 138; Dkt. No. 83-5 ¶¶ 3, 9; Dkt. No. 83-15, at 40.  Li was not compensated for the hours that she worked in excess of forty hours each workweek.  Dkt. No 83-5 ¶ 10.

According to Li's recollection, [13] she worked the following number of weekly hours and received the following wages since she resumed her employment with Defaulting Defendants in 2017:

| Dates Worked | Weekly Hours | Weekly Wages |
| --- | --- | --- |
| June 1, 2017 - October 31, 2017 | 72 | $1,484.00 |
| November 1, 2017 - April 30, 2018 | 68 | $1,274.00 |
| May 1, 2018 - June 30, 2018 | 72 | $1,484.00 |
| July 1, 2018 - August 31, 2018 | 68 | $1,274.00 |
| September 1, 2018 - October 31, 2018 | 72 | $1,484.00 |

---

[13] *See* Dkt. No. 83-5 ¶¶ 4-7; *see also* Dkt. No. 83-15, at 40-48.

| Dates Worked | Weekly Hours | Weekly Wages |
|---|---|---|
| November 1, 2018 - April 30, 2019 | 68 | $1,274.00 |
| May 1, 2019 - June 30, 2019 | 72 | $1,484.00 |
| July 1, 2019 - August 31, 2019 | 68 | $1,274.00 |
| September 1, 2019 - October 31, 2019 | 72 | $1,484.00 |
| November 1, 2019 - March 4, 2020 | 68 | $1,274.00 |

When Li was hired, Defaulting Defendants did not provide her with a wage notice in English or in Chinese, which is Li's primary language. Dkt. No. 83-5 ¶ 11. Defaulting Defendants also failed to provide Li with a wage statement with each wage payment. *Id.* ¶ 12.

### 6.    Plaintiff Jia Si

Plaintiff Si is a resident of Nassau County and was employed by Defendants as a receptionist, makeup artist, retoucher, and poster designer from November 2015 to March 14, 2020.[14] Dkt. No. 8 ¶¶ 29-30; Dkt. No. 83-11 ¶ 3. Si was hired to work in Defaulting Defendants' various stores. Dkt. No. 83-11 ¶ 3.

Throughout her employment, Si worked six or seven days per week without set days of rest. *Id.* ¶ 4. When she worked in-store, Si's hours were from around 9:00 a.m. or 10:00 a.m. to around 8:00 p.m. and sometimes from around 6:00 a.m. or 7:00 a.m. to around 8:00 p.m. *Id.* When she worked at clients' weddings, Si's hours were from around 9:00 a.m. or 10:00 a.m. to around 9:00 p.m. or 10:00 p.m., or from around 7:00 a.m. or 8:00 a.m. to around 9:00 p.m. or 10:00 p.m. *Id.* Si recorded the hours she worked using a time tracking device. *Id.* ¶ 6.

Si earned $8.00 per hour from November 2015 through December 2016. *Id.* ¶ 7. In 2017 through mid- 2018, Si earned $10.00 per hour. *Id.* In mid-2018, Si received a raise to $12.00 per hour, which is the rate she earned through the end of her employment. *Id.* Si was not compensated for all of the hours that she worked in excess of forty hours each workweek. *Id.*

---

[14] According to the Amended Complaint, Si is a resident of Queens County (Dkt. No. 8 ¶ 29), but in her declaration, Si states that she is a resident of Nassau County (Dkt. No. 83-11 ¶ 1).

According to Si's recollection,[15] she worked the following number of weekly hours and received the following hourly wages:

| Dates Worked | Weekly Hours | Hourly Wages |
|---|---|---|
| November 1, 2015 - December 31, 2016 | 80.44[16] | $8.00 |
| January 1, 2017 - June 30, 2018 | 80.44 | $10.00 |
| July 1, 2018 - March 14, 2020 | 80.44 | $12.00 |

When Si was hired, Defaulting Defendants did not provide her with a wage notice in English or in Chinese, which is Si's primary language. Dkt. No. 83-11 ¶ 10. Defaulting Defendants also failed to provide Si with a wage statement with each monthly wage payment. *Id.* ¶ 11.

### 7.    Plaintiff Yiting Su

Plaintiff Su is a resident of Queens and was employed by Defendants as a receptionist from September 15, 2010 to March 15, 2020. Dkt. No. 8 ¶¶ 19-20; Dkt. No. 83-6 ¶ 3. Su was hired to work at Defendants' store located at 42-55 Main Street in Flushing. Dkt. No. 83-6 ¶ 3.

Su regularly worked five or six days per week without set days of rest. Dkt. No. 8 ¶ 145; Dkt. No. 83-6 ¶ 4. In general, she worked from around 10:00 a.m. to 7:00 p.m. or 8:00 p.m. each day. Dkt. No. 8 ¶ 145; Dkt. No. 83-6 ¶ 4. In 2020, she worked from 12:00 p.m. to 7:00 p.m. Dkt. No. 8 ¶ 145; Dkt. No. 83-6 ¶ 4. Su kept track of her time with a time-tracking device. Dkt. No. 83-6 ¶ 5.

---

[15] *See* Dkt. No. 83-11 ¶¶ 4,7; *see also* Dkt. No. 83-15, at 99-102.

[16] As explained above, Si's schedule varied each week. In Plaintiffs' damages calculation, they assume that Si worked 6.5 days per week, during which she worked in the office for twelve hours per day for half of the week, and on the other days, she worked at clients' weddings for 12.75 hours per day. Si's calculations are: 12 hours * (6.5 days/2) + 12.75 hours * (6.5 days/2) = 80.4375 hours in total per week, which is rounded up to 83.44 hours. *See* Dkt. No. 83-15, at 98 n.23.

Su received commission in addition to hourly payrates. Dkt. No. 83-6 ¶ 6. In 2010, Su's hourly rate was $7.00 per hour. Dkt. No. 83-6 ¶ 6. In 2011, she received a raise to $7.50 per hour. *Id.* In 2017, Su received another raise to $9.00 per hour, which remained her hourly wage until her employment ended. *Id.* Su was not compensated for all of the hours that she worked in excess of forty hours per workweek. *Id.* ¶ 7.

According to Su's recollection,[17] she worked the following number of weekly hours and received the following hourly wages:

| Dates Worked | Weekly Hours | Hourly Wages |
|---|---|---|
| September 15, 2010 - May 25, 2014 | 60 | $7.00 |
| May 26, 2014 - December 31, 2016 | 60 | $7.50 |
| January 1, 2017 - March 15, 2020 | 60 | $9.00 |

When Su was hired, Defaulting Defendants did not provide her with a wage notice in English or in Chinese, which is Su's primary language. Dkt. No. 83-6 ¶ 8. Defaulting Defendants also failed to provide Su with a wage statement with each monthly wage payment. *Id.* ¶ 9.

### 8.    Plaintiff Haoyi Xie

Plaintiff Xie is a resident of Nassau County and was employed by Defendants as a videographer from April 27, 2013 to March 15, 2020. Dkt. No. 8 ¶¶ 21-22; Dkt. No. 83-7 ¶ 3. Xie was hired to work at Paris Wedding Center but was often required to work at Defaulting Defendants' other stores in Brooklyn and Chinatown. Dkt. No. 83-7 ¶¶ 3, 11. Xie also received assignments for weddings outside of New York, including in Pennsylvania, Connecticut, and New Jersey. *Id.* ¶ 11.

Xie regularly worked seven days per week without set days of rest. *Id.* ¶ 4. Xie either worked a half-day shift of five hours, a full-day shift of ten hours, or a full day and night schedule

---

[17] *See* Dkt. No. 83-6 ¶¶ 4,6; *see also* Dkt. No. 83-15, at 48-53.

of twelve hours. *Id.* She was also required to spend time at home editing the films. *Id.* For each half-day of filming, Xie would spend approximately an equal amount of time on editing as filming. *Id.* When Xie worked full days or full days and nights, she regularly spent two to three times as many hours editing as she spent filming. *Id.* Xie estimates that during Peak Wedding Season, she worked approximately 120 hours per week, and during Non-Peak Season, she worked ninety-six hours per week. *Id.* ¶¶ 6-7.[18] Xie did not use a time tracking device to track the hours that she worked. *Id.* ¶ 8.

Xie received a fixed monthly wage, regardless of the number of hours she worked. *Id.* ¶ 9. Xie's starting monthly wage was $1,500.00, and when her employment ended in March 2020, Xie was earning $3,200.00 per month regardless of the number of hours that she worked. *Id.* Xie was not compensated for all of the hours that she worked in excess of forty hours per workweek. *Id.* ¶ 10.

According to Xie's recollection, [19] she worked the following number of weekly hours and received the following monthly wages:

| Dates Worked | Weekly Hours | Monthly Wages |
|---|---|---|
| May 1, 2013 - June 30, 2014 | 120 | $1,500.00 |
| July 1, 2014 - August 31, 2014 | 96 | $1,500.00 |
| September 1, 2014 - October 31, 2014 | 120 | $1,500.00 |
| November 1, 2014 - April 30, 2015 | 96 | $1,500.00[20] |
| May 1, 2015 - June 30, 2015 | 120 | $2,000.00 |
| July 1, 2015 - August 31, 2015 | 96 | $2,000.00 |
| September 1, 2015 - October 31, 2015 | 120 | $2,000.00 |
| November 1, 2015 - April 30, 2016 | 96 | $2,000.00[21] |

---

[18] The Court discusses the reasonableness of the proffered 120 hours per week below.

[19] *See* Dkt. No. 83-7 ¶¶ 4-9; *see also* Dkt. No. 83-15, at 53-70.

[20] Xie states that on April 1, 2015, her monthly wage increased to $2,000.00 (Dkt. No. 83-7 ¶ 9), but Plaintiffs' calculations do not account for this increase until May 1, 2015 (Dkt. No. 83-15, at 56).

[21] Xie states that on April 1, 2016, her monthly wage increased to $2,300.00 (Dkt. No. 83-7 ¶ 9), but Plaintiffs' calculations do not account for this increase until May 1, 2016 (Dkt. No. 83-15, at 58).

| Dates Worked | Weekly Hours | Monthly Wages |
|---|---|---|
| May 1, 2016 - June 30, 2016 | 120 | $2,300.00 |
| July 1, 2016 - August 31, 2016 | 96 | $2,300.00 |
| September 1, 2016 - October 31, 2016 | 120 | $2,300.00 |
| November 1, 2016 - April 30, 2017 | 96 | $2,300.00[22] |
| May 1, 2017 - June 30, 2017 | 120 | $2,600.00 |
| July 1, 2017 - August 31, 2017 | 96 | $2,600.00 |
| September 1, 2017 - October 31, 2017 | 120 | $2,600.00 |
| November 1, 2017 - April 30, 2018 | 96 | $2,600.00 |
| May 1, 2018 - June 30, 2018 | 120 | $2,600.00[23] |
| July 1, 2018 - August 31, 2018 | 47 | $3,200.00 |
| September 1, 2018 - October 31, 2018 | 120 | $3,200.00 |
| November 1, 2018 - December 30, 2018 | 96 | $3,200.00 |
| December 31, 2018 - April 30, 2019 | 42 | $3,200.00 |
| May 1, 2019 - June 30, 2019 | 120 | $3,200.00 |
| July 1, 2019 - August 31, 2019 | 96 | $3,200.00 |
| September 1, 2019 - October 31, 2019 | 94 | $3,200.00 |
| November 1, 2019 - March 15, 2020 | 96 | $3,200.00 |

When Xie was hired, Defaulting Defendants did not provide her with a wage notice in English or in Chinese, which is Xie's primary language. Dkt. No. 83-7 ¶ 13. Defaulting Defendants also failed to provide Xie with a wage statement with each monthly wage payment. *Id.* ¶ 14.

9. **Plaintiff Junwu Yao**

Plaintiff Yao is a resident of Nassau County and was employed by Defendants as a photographer from March 2010 to March 1, 2020. Dkt. No. 8 ¶ 23-24; Dkt. No. 83-8 ¶ 1. Yao was employed to work at Paris Wedding Center but was often sent to work at Defaulting Defendants' other stores in Brooklyn and Chinatown. Dkt. No. 83-8 ¶¶ 3, 14.

---

[22] Xie states that on April 1, 2017, her monthly wage increased to $2,600.00. Dkt. No. 83-7 ¶ 9. Plaintiffs' calculations do not account for this increase until May 1, 2017. See Dkt. No. 83-15, at 61.

[23] Xie states that on June 1, 2018, her monthly wage increased to $3,200.00. Dkt. No. 83-7 ¶ 9. Plaintiffs' calculations do not account for this increase until July 1, 2018. *See* Dkt. No. 83-15, at 64.

Yao regularly worked six days per week without set days of rest. *Id.* ¶ 5. Yao either worked a half-day shift of five hours, a full-day shift of ten hours, or a full day and night schedule of twelve hours. *Id.* He was also required to spend time at home to touch up the photos, which often took at least three to four hours. *Id.* According to Yao's calculations, he worked an average of sixty-four hours per week during Peak Season and forty-two hours per week during Non-Peak Season. *Id.* ¶¶ 8-9. Yao was not required to keep track of his time with a time-tracking device. *Id.* ¶ 11.

From Fall 2010 through June 30, 2016, Yao was paid $2,500.00 per month. *Id.* ¶ 12. On July 1, 2016, Yao received a raise to $3,600.00 per month, and on July 1, 2018, he received a raise to $3,800.00 per month. *Id.* Yao was paid these fixed monthly rates regardless of the number of hours that he worked, and he was not paid for all of the hours that he worked in excess of forty hours per workweek. *Id.* ¶¶ 12-13.

According to Yao's recollection,[24] he worked the following number of weekly hours and received the following monthly wages:

| Dates Worked | Weekly Hours | Monthly Wages |
|---|---|---|
| Fall 2010 - June 30, 2014 | 64 | $2,500.00 |
| July 1, 2014 - August 31, 2014 | 42 | $2,500.00 |
| September 1, 2014 - October 31, 2014 | 64 | $2,500.00 |
| November 1, 2014 - April 30, 2015 | 42 | $2,500.00 |
| May 1, 2015 - June 30, 2015 | 64 | $2,500.00 |
| July 1, 2015 - August 31, 2015 | 42 | $2,500.00 |
| September 1, 2015 - October 31, 2015 | 64 | $2,500.00 |
| November 1, 2015 - April 30, 2016 | 42 | $2,500.00 |
| May 1, 2016 - June 30, 2016 | 64 | $2,500.00 |
| July 1, 2016 - August 31, 2016 | 42 | $3,600.00 |
| September 1, 2016 - October 31, 2016 | 64 | $3,600.00 |
| November 1, 2016 - April 30, 2017 | 42 | $3,600.00 |
| May 1, 2017 - June 30, 2017 | 64 | $3,600.00 |
| July 1, 2017 - August 31, 2017 | 42 | $3,600.00 |
| September 1, 2017 - October 31, 2017 | 64 | $3,600.00 |

---

[24] *See* Dkt. No. 83-78¶¶ 4-12; *see also* Dkt. No. 83-15, at 70-86.

| Dates Worked | Weekly Hours | Monthly Wages |
|---|---|---|
| November 1, 2017 - April 30, 2018 | 42 | $3,600.00 |
| May 1, 2018 - June 30, 2018 | 64 | $3,600.00 |
| July 1, 2018 - August 31, 2018 | 42 | $3,800.00 |
| September 1, 2018 - October 31, 2018 | 64 | $3,800.00 |
| November 1, 2018 - April 30, 2019 | 42 | $3,800.00 |
| May 1, 2019 - June 30, 2019 | 64 | $3,800.00 |
| July 1, 2019 - August 31, 2019 | 42 | $3,800.00 |
| September 1, 2019 - October 31, 2019 | 64 | $3,800.00 |
| November 1, 2019 - March 1, 2020 | 42 | $3,800.00 |

When Yao was hired, Defaulting Defendants did not provide him with a wage notice in English or in Chinese, which is Yao's primary language. Dkt. No. 83-8 ¶ 15. Defaulting Defendants also failed to provide Yao with a wage statement with each monthly wage payment. *Id.* ¶ 15.

### 10.    Plaintiff Rong Hua Zheng

Plaintiff Zheng is a resident of Nassau County and was employed by Defaulting Defendants at various times from October 2012 through March 15, 2020. Dkt. No. 8 ¶¶ 25-26; Dkt. No. 83-9 ¶¶ 1, 3.[25] Zheng was initially hired to work as an assistant at Paris Wedding Center but was later promoted to photographer. Dkt. No. 83-9 ¶¶ 3-5. Zheng worked at Defaulting Defendants' various stores and also traveled to clients' weddings outside the State of New York. *Id.* ¶ 21.

Zheng's schedule varied. In January and February, he worked an average of four days per week from 12:00 p.m. to 5:00 p.m. *Id.* ¶ 15. In March and August to November, Zheng worked an average of six days per week, three days from 12:00 p.m. to 5:00 p.m. and the other three from 12:00 p.m. to 10:30 p.m. *Id.* ¶ 10, 12. From April to July, Zheng would work six days per week,

---

[25] In his affidavit, Zheng states that from October 12 to May 2014, he worked as an assistant at Paris Wedding Center. Dkt. No. 83-9 ¶ 3. Zheng further states that "[f]rom on or about May 2014 to 2016, I was promoted to photographer" (*id.* ¶ 4), and "[f]rom on or about August 1, 2018, to March 15, 2020, I was employed as a photographer" (*id.* ¶ 5). Because Zheng does not affirmatively state that he was employed by Defaulting Defendants from May 2014 through June 31, 2018, and because Plaintiffs do not provide calculations for Zheng's pre-2018 work (Dkt. 83-15, at 86-87), the Court limits its analysis to August 1, 2018 through March 15, 2020.

three days from 12:00 p.m. to 10:30 p.m. and the other three days from 12:00 p.m. to 8:00 p.m. *Id.* ¶ 10.  In December, Zheng would work six days per week, five days from 12:00 p.m. to 5:00 p.m. and one day from 12:00 p.m. to 8:00 p.m.  *Id.* ¶ 14.  Zheng was not required to record his hours when he worked for Defaulting Defendants during the relevant time period.  *Id.* ¶ 16.

From August 1, 2018 through March 15, 2020, Zheng received a fixed wage of $3,600.00 per month regardless of the number of hours that he worked.  *Id.* ¶ 18.  Zheng was not compensated for the hours he worked in excess of forty hours each workweek.  *Id.* ¶ 20.  According to Zheng's recollection,[26] he worked the following number of weekly hours and received the following monthly wages:

| Dates Worked | Weekly Hours | Monthly Wages |
|---|---|---|
| August 1, 2018 - August 31, 2018 | 33 | $3,600.00 |
| September 1, 2018 - November 30, 2018 | 46.5 | $3,600.00 |
| December 1, 2018 - December 31, 2018 | 33 | $3,600.00 |
| January 1, 2019 - February 28, 2019 | 20 | $3,600.00 |
| March 1, 2019 - March 31, 2019 | 46.5 | $3,600.00 |
| April 1, 2019 - July 31, 2019 | 55.5 | $3,600.00 |
| August 1, 2019 - August 31, 2019 | 33 | $3,600.00 |
| September 1, 2019 - November 30, 2019 | 46.5 | $3,600.00 |
| December 1, 2019 - December 31, 2019 | 33 | $3,600.00 |
| January 1, 2020 - February 29, 2020 | 20 | $3,600.00 |
| March 1, 2020 - March 15, 2020 | 46.5 | $3,600.00 |

When Zheng was hired, Defaulting Defendants did not provide him with a wage notice in English or in Chinese, which is Zheng's primary language.  Dkt. No. 83-9 ¶ 22.  Defaulting Defendants also failed to provide Zheng with a wage statement with each monthly wage payment. *Id.* ¶ 23.

---

[26] Dkt. No. 83-9 ¶¶ 10-15, 19; Dkt. No. 83-15, at 86-92.

11.    **Plaintiff Xingwei Zhu**

Plaintiff Zhu is a resident of Queens and was employed by Defendants as a videographer from March 1, 2017 to March 15, 2020.  Dkt. No. 8 ¶ 27-28; Dkt. No. 83-10 ¶ 1.  Zhu was employed to work at Defaulting Defendants' various store locations.  Dkt. No. 83-10 ¶ 3.

Zhu regularly worked five to six days per week without set days of rest.  *Id.* ¶ 4.  Zhu's work consisted of wedding filming, which required him to work five-, ten-, or twelve-hour shifts.  *Id.*  Zhu also had to edit the films—for each five-hour shift, he would spend five hours editing, and for each ten or twelve-hour shift, he would spend double the amount of time editing.  *Id.*  During Peak Season, Zhu worked an average of sixty-four hours per week, excluding the time he spent editing films.  *Id.* ¶¶ 5-7.  During Non-Peak Season, Zhu worked an average of forty-two hours per week, excluding editing time.  *Id.* ¶¶ 8-9.  Zhu was not required to record the hours that he worked.  *Id.* ¶ 10.

Zhu received a fixed monthly rate of pay regardless of the number of hours that he worked.  *Id.* ¶ 11.  From March 1 to March 31, 2017, Zhu received $1,300.00 per month.  *Id.*  From April 2017 through July 2019, he earned $1,500.00 per month.  *Id.*  In July 2019, Zhu began earning $2,300.00 per month, which remained his monthly wage until his employment ended in March 2020.  *Id.*  Zhu was not compensated for the hours that he worked in excess of forty hours each workweek.  *Id.* ¶ 12.

According to Zhu's recollection, [27] he worked the following number of weekly hours and received the following monthly wages:

| Dates Worked | Weekly Hours | Monthly Pay |
|---|---|---|
| March 1, 2017 - March 31, 2017 | 42 | $1,300.00 |
| April 1, 2017 - April 30, 2017 | 42 | $1,500.00 |
| May 1, 2017 - June 30, 2017 | 64 | $1,500.00 |

---

[27] Dkt. No. 83-10 ¶¶ 4-11; Dkt. No. 83-15, at 92-98.

| Dates Worked | Weekly Hours | Monthly Pay |
|---|---|---|
| July 1, 2017 - August 31, 2017 | 42 | $1,500.00 |
| September 1, 2017 - October 31, 2017 | 64 | $1,500.00 |
| November 1, 2017 - December 31, 2017 | 42 | $1,500.00 |
| January 1, 2018 - April 30, 2018 | 42 | $1,500.00 |
| May 1, 2018 - June 30, 2018 | 64 | $1,500.00 |
| July 1, 2018 - August 31, 2018 | 42 | $1,500.00 |
| September 1, 2018 - October 31, 2018 | 64 | $1,500.00 |
| November 1, 2018 - December 31, 2018 | 42 | $1,500.00 |
| January 1, 2019 - April 30, 2019 | 42 | $1,500.00 |
| May 1, 2019 - June 30, 2019 | 64 | $1,500.00 |
| July 1, 2019 - August 31, 2019 | 42 | $2,300.00 |
| September 1, 2019 - October 31, 2019 | 64 | $2,300.00 |
| November 1, 2019 - March 15, 2020 | 42 | $2,300.00 |

When Zhu was hired, Defaulting Defendants did not provide him with a wage notice in English or in Chinese, which is Zhu's primary language.  Dkt. No. 83-10 ¶ 13.  Defaulting Defendants also failed to provide Zhu with a wage statement with each monthly wage payment. *Id.* ¶ 14.

## C.    Procedural History

On May 26, 2020, Plaintiffs Cao, He, Jia, Jin, Li, Su, Xie, Yao, Zheng, and Zhu filed their initial complaint against Defaulting Defendants, Max Huang, Sau W. Lam, and Fiona Ruihua Yang for failure to pay minimum and overtime wages in accordance with the FLSA and the NYLL, failure to pay spread-of-hours compensation in accordance with the NYLL, and failure to provide proper wage notices and wage statements in accordance with the NYLL.  *See generally* Dkt. No. 1.

On August 27, 2020, Plaintiffs filed an amended complaint ("Amended Complaint") adding Chen and Si as Plaintiffs and adding Max Wedding NY Inc. d/b/a Paris Wedding Center ("Max Wedding NY"), Max Wedding BK Inc d/b/a Paris Wedding Brooklyn ("Max Wedding BK"), and ABC Corp. d/b/a Max Photo NY d/b/a Maxhuang Studio ("ABC Corp") as Defendants

under a theory of successor liability. *See* Dkt. No. 8 ¶¶ 95-98.[28]  The Amended Complaint seeks a declaratory judgment; injunctive relief; compensatory, liquidated, and punitive damages; interest; and an award of attorneys' fees and costs against all Defendants. *See id.* at 49-51.

On October 8, 2020, Plaintiffs served each Defaulting Defendant with a copy of the amended summons and Amended Complaint by delivering copies to the New York Secretary of State. *See* Dkt. No. 12.  Defendants Max Wedding NY, Max Wedding BK, and Max Huang (the "Huang Defendants") filed an answer with counterclaims and cross-claims on February 5, 2021. *See* Dkt. No. 14.  The Huang Defendants later amended their answer and counterclaims and also brought cross-claims and a third-party complaint for assault and battery against third-party defendant Jia Jia.  *See* Dkt. No. 21.  Defaulting Defendants did not file an answer or otherwise respond to the Amended Complaint or cross-claims.

On February 16, 2022, after discovery closed and the parties filed their proposed joint pre-trial order (Dkt. No 39), the Court held a pretrial conference with Plaintiffs and the Huang Defendants.  *See* Feb. 16, 2022 Minute Entry and Dkt. Order.  Recognizing that Defaulting Defendants had not appeared in the case, the Court ordered the parties to file their respective default judgment motions within sixty days.  *Id.*  The Court deferred setting a trial date until after these motions were resolved.  *See id.*

Months passed and neither Plaintiffs nor the Huang Defendants filed their respective motions.  On May 9, 2022, the Court extended the motions deadline to May 23, 2022 and ordered the parties to show cause as to why monetary sanctions should not be imposed for their failure to comply with the Court's February 16, 2022 order.  *See* May 9, 2022 Dkt. Order.  On May 16, 2022,

---

[28] Plaintiffs explain in their Amended Complaint that they added Huang, Max Wedding NY, and Max Wedding BK as defendants because they had doubts about whether Defaulting Defendants could provide them relief.  Dkt. No. 8 ¶ 101.

Plaintiffs requested certificates of default against the Defaulting Defendants, which the Clerk of Court entered on May 24, 2022. *See* Dkt. Nos. 49-50. Because Plaintiffs once again did not comply with the Court's extended motions deadline, the Court sanctioned Plaintiffs' counsel $500.00. *See* May 27, 2022 Dkt. Order. The Court also granted Plaintiffs' belated request for a further extension of time to file their motions for default judgment.

On June 6, 2022, Plaintiffs filed their first motion for default judgment against Defaulting Defendants, which the Court referred to the then-assigned magistrate judge, Magistrate Judge Roanne L. Mann, for a report and recommendation. *See* Dkt. No. 54; *see also* June 7, 2022 Dkt. Order. On October 14, 2022, Judge Mann issued a report and recommendation, recommending that Plaintiffs' motion for default judgment be denied without prejudice and with leave to renew following the resolution of Plaintiffs' claims against the Huang Defendants. *See* Dkt. No. 66. Judge Mann reasoned that "entering a default judgment on liability against some defendants while others continue to defend the case would run the risk of inconsistent judgments." Dkt. No. 66, at 7 (citation omitted). Plaintiffs would not suffer any prejudice, Judge Mann explained, as Defaulting Defendants were "*out of business and presumably judgment-proof, see* Dkt. 8 ¶ 101." *See* Dkt. No. 66, at 6 (emphasis added). Plaintiffs were also "clearly in no rush to pursue default judgments." *Id.*

On November 7, 2022, Judge Kovner adopted Judge Mann's report and recommendation. *See* Nov. 7, 2022 Order. On December 1, 2022, the Court entered an Order warning Defaulting Defendants that "if they d[id] not appear in this action well before the start of trial, issues and claims may be decided against them at trial and they may be held liable accordingly." *See* Dec. 1, 2022 Dkt. Order.

On April 3 and April 4, 2023, the Court held a bench trial with Plaintiffs and the Huang Defendants.  *See* Apr. 4, 2023 Dkt. Entries.  As stated on the record, the Court dismissed Plaintiffs' claims against non-appearing defendants Fiona Yang and Sam Lau for failure to serve under Fed. R. Civ. P. 4(m).  *See id.*  The Court dismissed the Huang Defendants' cross-claims against the Defaulting Defendants, Fiona Yang, and Sam Lau, for the same reason.  *Id.*  Lastly, the Court dismissed Plaintiff Cao's claims after Plaintiff's counsel represented that Cao had returned to China and would not be appearing at the trial.  *See* April 3, 2023 Trial Transcript ("Apr. 3, 2023 Tr."), at 7:1-23.

The trial was limited to the issue of the Huang Defendants' successor liability.  *See id.*, at 7:3-7; *see* April 4, 2023 Trial Transcript ("Apr. 4, 2023 Tr."), at 147:9-17.  The Court found in favor of the Huang Defendants and found that Plaintiffs had failed to prove successor liability. *See* Apr. 4 2023 Tr., at 159:17-20.  The Court dismissed Plaintiffs' claims against the Huang Defendants.[29]  *See* Apr. 4, 2023 Dkt. Entries.[30]  Plaintiffs were ordered to file their motions for default judgment against Defaulting Defendants, who were the only remaining defendants in the case.  *See id.*

On May 5, 2023, Plaintiffs filed their motion for default judgment against Defaulting Defendants.  *See* Dkt. No. 82.  Plaintiffs' motion includes: (1) a notice of motion (Dkt. No. 82); (2) a memorandum of law (Dkt. No. 86); (3) affidavits and declarations from each Plaintiff (Dkt. Nos. 83-2 – 83-12); (4) an affirmation from Ziyi Gao, Plaintiffs' counsel (Dkt. No. 85); (5) the Amended Complaint and Certificate of Default (Dkt. Nos. 83-1, 83-14); (6) damages calculations

---

[29] Although Defendant ABC Corp. did not join in the Huang Defendants' answer and has not otherwise appeared in this case, they were terminated from this case, likely because they were doing business as Maxhuang Studio.  *See* Dkt. Nos. 8, 154.  Plaintiffs also did not mention Defendant ABC Corp. at the trial.

[30] The Huang Defendants voluntarily dismissed their claims against third-party defendant Jia Jia, and Jia Jia was subsequently dismissed from the case.  *See* Apr. 4, 2023 Dkt. Entries.

(Dkt. No. 83-15); (7) billing invoice (Dkt. No. 83-16); (8) a proposed form of default judgment (Dkt. No. 84); and (9) a certificate of service (Dkt. No. 87).

## LEGAL STANDARDS

"Rule 55 of the Federal Rules of Civil Procedure provides a two-step process for obtaining a default judgment." *Priestley v. Headminder, Inc.*, 647 F.3d 497, 504 (2d Cir. 2011).  At the first step, the Clerk of Court enters a party's default after an affidavit or other evidence shows that the "party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend." Fed. R. Civ. P. 55(a); *see Esquivel v. Lima Rest. Corp.*, No. 20-CV-2914 (ENV) (MMH), 2023 WL 6338666, at *3 (E.D.N.Y. Sept. 29, 2023) ("when a party uses an affidavit or other proof to show that a party has 'failed to plead or otherwise defend' against an action, the clerk shall enter a default." (citing Fed. R. Civ. P. 55(a)).  "If a claim is for 'a sum certain or a sum that can be made certain by computation,' the clerk can enter judgment." *Id.* (citing Fed. R. Civ. P. 55(b)(1)).

At the second step, and "[i]n all other cases, the party must apply to the court for a default judgment." *Id.* (citing Fed. R. Civ. P. 55(b)(2)).  To "enter or effectuate judgment" the Court is empowered to: "(A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter."  Fed. R. Civ. P. 55(b)(2).

The Second Circuit "generally disfavor[s]" default judgment and has repeatedly expressed a "preference for resolving disputes on the merits." *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993).  Nevertheless, in evaluating a motion for default judgment, a court accepts as true the plaintiff's well-pleaded factual allegations, except those relating to damages.  *Greyhound Exhibitgroup*, *Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992); *see also Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974).  A plaintiff bears the burden of alleging "specific facts,"

rather than "mere labels and conclusions" or a "formulaic recitation of the elements," so that a court may infer a defendant's liability. *Cardoza v. Mango King Farmers Mkt. Corp.*, No. 14-CV-3314 (SJ) (RER), 2015 WL 5561033, at *3 (E.D.N.Y. Sept. 1, 2015) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), *report and recommendation adopted*, 2015 WL 5561180 (E.D.N.Y. Sept. 21, 2015).

The decision to grant or deny a default motion is "left to the sound discretion of a district court." *Esquivel*, 2023 WL 6338666, at *3 (quoting *Shah v. New York State Dep't of Civ. Serv.*, 168 F.3d 610, 615 (2d Cir. 1999)). A court "possesses significant discretion" in granting a motion for default judgment, "including [determining] whether the grounds for default are clearly established." *Chen*, 2023 WL 2583856, at *7 (quotations and citation omitted).

**JURISDICTION AND VENUE**

## I.     Subject Matter Jurisdiction

The Court has original jurisdiction over Plaintiffs' FLSA claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiffs' NYLL claims under 28 U.S.C. § 1367.

## II.    Personal Jurisdiction

"A court may not enter default judgment unless it has jurisdiction over the person of the party against whom the judgment is sought, which also means that he must have been effectively served with process." *BASF Corp. v. Original Fender Mender, Inc.*, No. 23-CV-2796 (HG) (JAM), 2023 WL 8853704, at *5 (E.D.N.Y. Dec. 22, 2023) (internal quotations and citation omitted).

Each Defaulting Defendant is a corporation or limited liability company formed or organized under New York Law. Dkt. No. 8 ¶¶ 34, 37, 40, 43, 46. Plaintiffs properly served Defaulting Defendants by delivering and leaving copies of the amended summons and Amended

Complaint with the New York Secretary of State. *See* Fed. R. Civ. P. 4(h)(1)(A); N.Y. Bus. Corp. L. § 306(b)(1); N.Y. Limit. Liab. Co. L. § 303; *see also* Dkt. No. 12. Accordingly, the Court has personal jurisdiction over Defaulting Defendants.

## III. Venue

"[A] civil action may be brought in a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." 28 U.S.C. § 1391(b)(1). A corporation is deemed to be a resident of "any district" in "a state which has more than one judicial district and in which . . . [that] corporation is subject to personal jurisdiction at the time an action is commenced." *Id.* § 1391(d). Venue is proper in this district because Defaulting Defendants' principal places of business are located within this district, and as such, they are residents of this district.

## PROCEDURAL COMPLIANCE WITH LOCAL CIVIL RULES 7.1 AND 55.2

"A motion for default judgment will not be granted unless the party making the motion adheres to all of the applicable procedural rules." *Annuity, Welfare & Apprenticeship Skill Improvement & Safety Funds of Int'l Union of Operating Engineers, Loc. 15, 15A, 15C & 15D, AFL-CIO v. Allstate Mapping & Layout, LLC*, No. 22-CV-1831 (PKC) (TAM), 2023 WL 1475389, at *1 (E.D.N.Y. Feb. 2, 2023) (quoting *Century Surety Company v. Adweek*, No. 16-CV-335 (ENV) (PK), 2018 WL 10466835, at *1 (E.D.N.Y. Jan. 9, 2018)). "[L]ocal rules have the force of law, as long as they do not conflict with a rule prescribed by the Supreme Court, Congress, or the Constitution." *See Fin. Servs. Vehicle Tr. v. Osmeña*, No. 22-CV-7491 (RPK) (CLP), 2023 WL 7000935, at *2 (E.D.N.Y. Aug. 15, 2023) (citations and quotation marks omitted).

Under Local Civil Rule 7.1, a motion for default judgment must consist of a notice of motion, a memorandum of law, and supporting affidavits and exhibits containing any factual

information and portions of the record necessary for the decision of the motion.  Loc. Civ. R. 7.1(a).  Under Local Civil Rule 55.2, a "party seeking a judgment by default . . . shall append to the application (1) the Clerk's certificate of default, (2) a copy of the claim to which no response has been made, and (3) a proposed form of default judgment," and must mail these three items to the "*last known business address*" of the defaulting party (if not an individual).  Loc. Civ. R. 55.2(b)-(c) (emphasis added).

Here, this Court finds that Plaintiffs have complied with Local Civil Rules 7.1 and 55.2(b).  Plaintiffs' motion includes a notice of motion (Dkt. No. 82), a memorandum of law (Dkt. No. 86), and affidavits or declarations from each remaining Plaintiff (Dkt. Nos. 83-2 – 83-12) in accordance with Local Civil Rule 7.1.  Plaintiffs also attach the Amended Complaint, certificates of default, and a proposed form of default judgment to their motion in accordance with Local Civil Rule 55.2(b).  *See* Dkt. Nos. 83-1, 83-14, and 84.

Plaintiffs have not, however, complied with Local Civil Rule 55.2(c) with respect to all of the Defaulting Defendants.  Local Civil Rule 55.2(c) states:

> Unless otherwise ordered by the Court, all papers submitted to the Court pursuant to Local Civil Rule 55.2(a) or (b) above shall simultaneously be mailed to the party against whom a default judgment is sought at the last known residence of such party (if an individual) or the last known business address of such party (if a person other than an individual). Proof of such mailing shall be filed with the Court. If the mailing is returned, a supplemental affidavit shall be filed with the Court setting forth that fact, together with the reason provided for return, if any.

In this respect, Local Civil Rule 55.2(c) supplements the default judgment procedure set forth by Federal Rule of Civil Procedure 55(b).  *See Transatlantic Auto Group, Inc. v. Unitrans-Pra Co.*, No. 09-CV-5070 (DLI) (CLP), 2011 WL 4543877, at *20 (E.D.N.Y. Sept 9, 2011) ("experience has shown that mailing notice of such an application is conducive both to fairness and efficiency"), *report and recommendation adopted*, 2011 WL 4543838 (Sept. 29, 2011*)*; *see*

*also* Committee Note, Loc. Civ. R. 55.2 (same).  To that end, "failure to comply with Local Rule 55.2(c) warrants denial of the motion for default judgment." *Allstate Ins. Co. v. Abramov*, 16-CV-1465 (AMD) (SJB), 2019 WL 1177854, at *3 (E.D.N.Y. Feb. 21, 2019) (citation omitted), *report and recommendation adopted*, 2019 WL 1172381 (E.D.N.Y. Mar. 13, 2019).

Indeed, Courts in the Eastern and Southern Districts of New York regularly deny such motions when strict procedural compliance is lacking.  *See, e.g., Vasquez v. Lahori Kebab & Grill Corp.*, 18-CV-2117 (JS) (SIL), 2019 WL 4396724, at *3 (E.D.N.Y. Aug. 13, 2019) (denying motion for default judgment as to the defendants that were not listed on the declaration of service), *report and recommendation adopted*, 2019 WL 4620922 (E.D.N.Y. Sept. 5, 2019); *Saheed v. Parker*, 17-CV-6151, 2019 WL 1324026, at *3 (S.D.N.Y. Mar. 25, 2019) (denying motion for default judgment where "the docket [did not] reflect an affidavit of service demonstrating that Plaintiff's motion and supporting papers were mailed to Defendant"); *Allstate Ins. Co.*, 2019 WL 1177854, at *5 (denying motion for default judgment in its entirety where ten of the twenty-five defaulting defendants were improperly served with the motion).

According to the certificate of service, Plaintiffs served Flushing Paris Wedding, Laffection Wedding, Paris Wedding Center, and Romantic Paris with their motion for default judgment by mailing a copy to 42-55 Main Street, Flushing, New York 11355.  *See* Dkt. No. 87. Plaintiffs served Wedding in Paris with the motion by mailing a copy to 4711 8th Ave, Brooklyn, New York 11220.  *See id.*  While Flushing Paris Wedding and Paris Wedding Center were properly served at their last known business address (*see* Dkt. No. 8 ¶¶ 34, 40, 46), Wedding in Paris, Laffection Wedding, and Romantic Paris were not.

According to the Amended Complaint, Laffection Wedding's principal place of business is 35-56 Main Street, Flushing, New York 11356 (*see id.* ¶ 37) and Romantic Paris's principal

place of business is 35 East Broadway, 1st Floor, New York 10002 (*see id.* ¶ 43).[31]  Thus, service at 42-55 Main Street, Flushing, New York 11355 is not proper for Laffection Wedding and Romantic Paris.

Additionally, according to the Amended Complaint, Wedding in Paris's principal place of business is "4711 8th Avenue, Units **1A, 1B**, Brooklyn, New York 11220" (*see id.* ¶ 46) (emphasis added).  Plaintiffs did not identify the proper location—specifically, Units 1A and 1B—when serving Wedding in Paris with the present motion, thereby rendering service at Wedding in Paris improper.

Plaintiffs' failure to serve Wedding in Paris, Laffection, and Romantic Paris at their last known business addresses warrants denial of Plaintiffs' motion against these defendants.  *See, e.g., Abramov*, 2019 WL 1177854, at *4 (recommending denying default judgment where plaintiff did not comply with Local Civil Rule 55.2(c)); *Vasquez*, 2019 WL 4396724, at *3 (same).  And even if Plaintiffs argue that service on Laffection, Wedding in Paris, and Romantic Paris was proper because Defaulting Defendants are a "single integrated wedding photography enterprise with a principal place of business" at this location, such an argument lacks merit.  The conflicting nature of Plaintiffs' description of Defaulting Defendants' last-known business addresses still warrants denial under Local Civil Rule 55.2(c).  *See Woodway USA, Inc. v. Speedfit LLC*, No. 22-CV-2455 (EK) (RER), 2023 WL 2969334, at *7 (E.D.N.Y. Feb. 2, 2023) ("That Woodway's complaint, the affidavits of service, and the Secretary of State's website offer multiple and conflicting addresses for Speedfit's place of business causes additional confusion regarding the proper place of mailing in order to demonstrate compliance with Local Rule 55.2(c).").  "As harsh at it may seem," courts in this district "have repeatedly" denied motions for default judgment based on a movant's failure

---

[31] The Court may look to the pleading or motion papers to determine the last known business address of the defendant.  *See, e.g., Abramov*, 2019 WL 1177854, at *4.

to adhere to the Local Rules. *Lugo v. Allstate Ins. Co.*, No. 19-CV-7150 (JMA) (JMW), 2022 WL 3928727, at *5 (E.D.N.Y. Aug. 10, 2022).

Accordingly, the undersigned respectfully recommends that Plaintiffs' motion be denied as it pertains to Defendants Wedding in Paris, Laffection Wedding, and Romantic Paris for failure to comply with Local Civil Rule 55.2(c).

## LIABILITY UNDER THE FLSA AND NYLL

### I.    Statute of Limitations

As a threshold matter, the Court considers whether Plaintiffs' claims are timely under the applicable statutes of limitations. *See Rodriguez v. Queens Convenience Deli Corp.*, No. 09-CV-1089 (KAM) (SMG), 2011 WL 4962397, at *2 (E.D.N.Y. Oct. 18, 2011). The FLSA statute of limitations is two years, "except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). "When a defendant defaults, the violation is considered 'willful' and the three-year statute of limitations applies." *Rodriguez*, 2011 WL 4962397, at *2 (citing *Blue v. Finest Guard Servs., Inc.*, No. 09-CV-133 (ARR), 2010 WL 2927398 (E.D.N.Y. June 24, 2010)). The statute of limitations for NYLL claims is six years. *See* NYLL §§ 198(3), 663(3). Both statutes start to run when the employee begins working for the employer. *Rodriguez*, 2011 WL 4962397, at *2 (citation omitted).

Here, Plaintiffs filed their initial complaint on May 26, 2020 and allege that Defaulting Defendants' FLSA violations were willful such that the three-year statute of limitations applies. *See* Dkt. No. 1; *see also* Dkt. No. 8 ¶¶3, 88, 230, 234, 241; Dkt. No. 86, at 10-11. Consequently, the FLSA limitations period would include claims that accrued between May 26, 2017 and May 26, 2020, and the NYLL limitations period would include claims that accrued between May 26,

2014 and May 26, 2020.  *See, e.g., Zhen Ming Chen v. Y Cafe Ave B Inc.*, No. 18-CV-4193 (JPO), 2019 WL 2324567, at *2 (S.D.N.Y. May 30, 2019).

## II.    Whether the FLSA Applies

To plead a cause of action under the FLSA, Plaintiffs must establish that: (1) Defaulting Defendants are employers subject to the FLSA; (2) Plaintiffs are employees within the meaning of the FLSA; (3) their employment relationships were not exempted from the statute; and (4) a violation of one of the statute's provisions.  *See Rowe v. CC Rest. & Bakery, Inc.*, No. 17-CV-01423 (CBA)(PK), 2019 WL 4395158, at *4 (E.D.N.Y. Aug. 15, 2019), *report and recommendation adopted*, 2019 WL 4393987 (E.D.N.Y. Sept. 13, 2019).

### A.    Whether Defaulting Defendants are Employers

The FLSA broadly defines an employer as "any person [or corporation] acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).  An employer is subject to the FLSA if it meets the criteria for either enterprise or individual coverage. *See Rowe*, 2019 WL 4395158, at *4; 29 U.S.C. §§ 203(s)(1)(A)(i)-(ii), 206(a), 207(a)(1).  Here, Plaintiffs allege that Defaulting Defendants meet the criteria for enterprise coverage.  *See* Dkt. No. 86 ¶ 16.

The enterprise coverage test considers whether the employer has employees engaged in commerce or in the production of goods for commerce, "or [ ] has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and . . . whose annual gross volume of sales made or business done is not less than $500,000." 29 U.S.C. § 203(s)(1)(A)(i-ii); *see also Fermin*, 93 F. Supp. 3d at 33.  "Commerce" is defined as "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof."  29 U.S.C. § 203(b).  "Even local

business activities fall within the reach of the FLSA when an enterprise employs workers who handle goods or materials that have moved or been produced in interstate commerce." *Rodriguez v. Almighty Cleaning, Inc.*, 784 F. Supp. 2d 114, 121 (E.D.N.Y. 2011) (quotations and citation omitted); *see also Kantor v. Air Atl. Med., P.C.*, No. 19-CV-03597 (EK) (ST), 2021 WL 3888067, at *4 (E.D.N.Y. July 7, 2021) ("[C]ourts have noted that virtually every enterprise in the nation doing the requisite dollar volume of business is covered by the FLSA." (internal quotations and citation omitted)), *report and recommendation adopted*, 2021 WL 3884193 (E.D.N.Y. Aug. 31, 2021).

Plaintiffs have established that Defaulting Defendants meet the criteria for the enterprise coverage test.  First, Plaintiffs allege that Defaulting Defendants had gross revenues in excess of $500,000 annually.  *See* Dkt. No. 8 ¶¶ 35, 38, 41, 43, 47.

Second, Plaintiffs allege that Defaulting Defendants were "regularly involved in interstate ecommerce" and had employees who purchased equipment and supplies originating from outside New York State, produced work product that was sent to persons outside New York, and used electronic devices to complete interstate credit card transactions.  *See id.* ¶¶ 36, 39, 42, 45, 48. Although these allegations are conclusory on their face, "multiple courts in this district have held that similarly conclusory allegations of enterprise coverage may be accepted on a motion for default judgment where it may be inferred from the type of business enterprise that it was engaged in interstate commerce." *Marine v. Vieja Quisqueya Rest. Corp.*, No. 20-CV-4671 (PKC) (RML), 2022 WL 17820084, at *3 (E.D.N.Y. Sept. 8, 2022); *see Newman v. W. Bar & Lounge, Inc.*, No. 20-CV-1141 (KAM) (RER), 2021 WL 2401176, at *5 (E.D.N.Y. June 11, 2021) ("[T]he court can reasonably infer that at least some materials handled by the plaintiff-employee have moved or

engaged in interstate or international commerce, such as the food, beverages, products, materials, and equipment utilized by the defendants.").

Here, the Court can infer that at least some of the materials handled by Defaulting Defendants' employees, such as photography film or makeup supplies, were purchased from out-of-state suppliers. *See Marine*, 2022 WL 17820084, at *3. In addition, Plaintiffs Xie and Zheng allege that Defaulting Defendants required them to work at out-of-state weddings. *See* Dkt. No. 8 ¶¶ 157, 176. Thus, it is reasonable for the Court to infer that other employees were likewise sent out-of-state, thereby satisfying the interstate commerce component of the enterprise coverage test.

**B.    Whether Plaintiffs were "Employees"**

An "employee" is likewise broadly defined in the FLSA as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). Each Plaintiff herein satisfies this definition insofar as they allege that Defaulting Defendants employed them in various positions within this statutory meaning. *See generally* Dkt. No. 8; *Chocolatl v. Rendezvous Cafe, Inc.*, No. 18-CV-3372 (CBA) (VMS), 2019 WL 5694104, at *5 (E.D.N.Y. Aug. 16, 2019) (determining that the plaintiff was an "employee" under the FLSA because the complaint alleged that he was employed by the defendants), *report and recommendation adopted*, 2020 WL 1270891 (E.D.N.Y. Mar. 17, 2020). Accordingly, Plaintiffs are covered employees under the FLSA.

**C.    Whether any FLSA Exemptions Apply**

Finally, Plaintiffs must show that they are not exempt from the FLSA's protections. *Fermin*, 93 F. Supp. 3d at 32. "[T]he FLSA contains a litany of exemptions." *Id.* (internal quotations omitted); *see* 29 U.S.C. § 213. These include "bona fide executive, administrative, or professional" employees, "outside salesmen," certain seasonal employees, some employees in fishing, agriculture, and small local newspaper employees, among many others. *See id.* An

employee's "exempt status depends less on his title, and more on the actual duties performed." *McBeth v. Gabrielli Trucks Sales, Ltd.*, 768 F. Supp. 2d 383, 387 (E.D.N.Y. 2010). "[T]he burden of invoking these exemptions rests upon the employer." *Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F.3d 217, 222 (2d Cir. 2002) (citing *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 394 n.11 (1960)).

Here, Plaintiffs do not allege any facts that would make them exempt under the FLSA or NYLL. And because Defaulting Defendants are in default, they have failed to sufficiently invoke any exemptions. *See Ore v. H & C Cleaning Corp.*, No. 22-CV-20 (AMD) (RER), 2022 WL 19520879, at *9 (E.D.N.Y. Dec. 14, 2022) (holding that statutory exemptions did not apply due to defendants' default), *report and recommendation adopted*, 2023 WL 2522814 (E.D.N.Y. Mar. 15, 2023). Consequently, Plaintiffs are properly considered non-exempt employees.

## III.    Whether the NYLL Applies

To prevail on their NYLL claims, Plaintiffs must first establish that their employment relationships are covered by the NYLL, which applies to "any person employed for hire by an employer in any employment." NYLL § 190. "Unlike the FLSA, the NYLL does not require that a defendant achieve a certain minimum in annual sales or business in order to be subject to the law." *Garcia v. Badyna*, No. 13-CV-4021 (RRM) (CLP), 2014 WL 4728287, at *6 (E.D.N.Y. Sept. 23, 2014). NYLL's definition of "employer" is otherwise "nearly identical" to that of the FLSA, and the analysis of the employment relationship under both statutes is based on the same factors. *See Mahoney v. Amekk Corp.*, No. 14-CV-4131 (ENV) (VMS), 2016 WL 6585810, at *9 (E.D.N.Y. Sept. 30, 2016) (collecting cases holding that the FLSA and NYLL are interpreted consistently with one another on the question of employer status), *report and recommendation adopted*, 2016 WL 6601445 (E.D.N.Y. Nov. 7, 2016).

Because each Plaintiff has established an employer-employee relationship with Defaulting Defendants under the FLSA, they also have established an employer-employee relationship under the NYLL.

## IV.    Whether Defaulting Defendants are Jointly and Severally Liable

Plaintiffs argue that Defaulting Defendants are jointly and severally liable because they operate as a single integrated enterprise. *See* Dkt. No. 8 ¶ 33; Dkt. No. 86, at 6.

Under the single integrated enterprise test for FLSA liability, "multiple legally distinct entities [can be] liable as a single employer when the entities are a single integrated enterprise." *Tecocoatzi-Ortiz v. Just Salad LLC*, No. 18-CV-7342 (JGK), 2019 WL 1585163, at *4 (S.D.N.Y. Apr. 12, 2019); *see also Romualdo v. Guru Krupa 105 Corp.*, No. 19-CV-5188 (DG) (SJB), 2023 WL 6167614, at *5 (E.D.N.Y. Sept. 1, 2023) (Under the single integrated enterprise theory, "an employee, who is technically employed on the books of one entity, which is deemed to be part of a larger single-employer entity, may impose liability for certain violations of employment law not only on the nominal employer but also on another entity comprising part of the single integrated employer."); *Ayala v. Your Favorite Auto Repair & Diagnostic Ctr., Inc.*, No. 14-CV-5269 (ARR) (JO), 2016 WL 5092588, at *16 (E.D.N.Y. Sept. 19, 2016) ("The single integrated enterprise doctrine allows for multiple defendants to be jointly and severally liable for any FLSA and NYLL violations.").

"Whether a group of entities qualifies as a single integrated enterprise turns on four factors: (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Tecocoatzi-Ortiz*, 2019 WL 1585163, at *4; *see also Brown v. Daikin Am. Inc.*, 756 F.3d 219, 226 (2d Cir. 2014) (articulating the same test).

"Although no one factor is dispositive, control of labor relations is the central concern." *Tecocoatzi-Ortiz*, 2019 WL 1585163, at *4.

Plaintiffs have established that Defaulting Defendants satisfy the single integrated enterprise test. First, Defaulting Defendants ran their business operations, including their finances, human resources, and taxes, out of Flushing Paris Wedding, which was their central location. *See* Dkt. No. 8 ¶ 33; Dkt. No. 83-2 ¶ 17. Second, Defaulting Defendants shared employees and regularly scheduled their employees to work at their various storefronts. *See* Dkt. No. 8 ¶¶ 103, 127, 135, 187, 198; *see also* Dkt. No. 83-2 ¶ 3; Dkt. No. 83-3 ¶3; Dkt. No. 83-4 ¶ 3; Dkt. No. 83-5 ¶ 3; Dkt. No. 83-7 ¶¶ 3,11; Dkt. No. 83-9 ¶ 21; Dkt. No. 83-12 ¶ 3; Dkt. No. 83-11 ¶ 3. Third, Defaulting Defendants were commonly owned and operated by the Individual Defendants. Dkt. No. 8 ¶ 33.

Accordingly, this Court finds that Defaulting Defendants are a single integrated enterprise and are thus jointly and severally liable for Plaintiffs' claims.

## V.    Plaintiffs' Wage Claims

### A.    Failure to Pay Minimum Wage

Subject to certain exceptions not relevant here, both the FLSA and NYLL require employers to pay their employees a minimum wage. "Section 206 of the FLSA sets forth a minimum hourly wage employers must pay their employees who engage in work affecting interstate commerce." *Santillan v. Henao*, 822 F. Supp. 2d 284, 291 (E.D.N.Y. 2011) (citing 29 U.S.C. § 206(a)(1)(C)). At all times relevant to this case, the federal minimum wage was $7.25 per hour. 29 U.S.C. § 206(a)(1)(C). The NYLL likewise requires employers to pay a minimum wage, *see* NYLL § 652, but New York's minimum wage is higher than the federal minimum. The state minimum hourly wage during the relevant time periods was as follows:

| December 31, 2013 – December 30, 2014 | $8.00 |
| December 31, 2014 – December 30, 2015 | $8.75 |
| December 31, 2015 – December 30, 2016 | $9.00 |
| December 31, 2016 – December 30, 2017 | $11.00 |
| December 31, 2017 – December 30, 2018 | $13.00 |
| December 31, 2018 onward | $15.00 |

*Id.*[32] "An employee bringing an action for unpaid minimum wages under the FLSA and the NYLL has the burden of proving that he performed work for which he was not properly compensated." *Fermin*, 93 F. Supp. 3d at 41 (internal quotation marks and citation omitted).

To determine whether Plaintiffs were paid the prevailing minimum wage, the Court must calculate Plaintiffs' regular hourly rates of pay. To calculate the hourly rate of pay of an employee paid a fixed monthly amount, the Court must first calculate the employee's regular weekly pay by multiplying their monthly pay by 12 (the number of months) and dividing by 52 (the number of weeks). *See Juan Liu v. Five Stars Beauty Spa, Inc.*, No. 21-CV-11101 (RA) (KHP), 2023 U.S. Dist. LEXIS 87560, at *13 (S.D.N.Y. May 17, 2023) (calculating weekly pay from fixed monthly rate); *Gunawan v. Sake Sushi Rest.*, 897 F. Supp. 2d 76, 89 (E.D.N.Y. 2012) (same).

The employee's hourly rate of pay is then calculated by diving the weekly salary by "the total number of hours actually worked." 29 C.F.R. § 778.109 ("The regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid."); *see also* 12 N.Y.C.R.R. § 142-2.16 ("When an employee is paid on . . . any basis other than hourly rate, the regular hourly wage rate shall be determined by dividing the total hours worked during the week into the employee's total

---

[32] Because Plaintiffs allege that "throughout [their] employment, Defendants have had at least 20-25 employees" (Dkt. No. 8 ¶ 222), the minimum wage for large employers with eleven or more employees applies to Plaintiffs' claims (NYLL § 652(1)(a)(ii)).

earnings.").  The Court presumes that Plaintiffs' recollections and estimates of the hours worked are accurate in light of Defaulting Defendants' default.  *See Cabrera v. Canela*, 412 F. Supp. 3d 167, 181 (E.D.N.Y. 2019) (it would be unfair to require more substantial proof of improper compensation when the defendant is not participating in the case and the plaintiff lacks the ability to obtain the defendant's employment records through discovery); *Fermin*, 93 F. Supp. 3d at 42 n.10 (accepting as true plaintiffs' estimated dates of employment, hours worked, and rates of pay for purposes of resolving a motion for default judgment).  In addition, several Plaintiffs state that they were often paid in cash, and others allege that they were not required to keep track of their time and are unaware of Defaulting Defendants having used any time tracking device that would have reflected actual hours worked.  In short, more precise evidence than Plaintiffs' recollections may not even exist.  *See Zabrodin*, 2023 WL 8009319, at *8.

Applying the above standards,  Plaintiffs Chen, He, Jia, Jin, Si, Su, Xie, Zheng, and Zhu have established that Defaulting Defendants paid them less than minimum wage.  Each Plaintiff's minimum wage claim is analyzed below.

### 1.    Chen

Chen was paid a fixed monthly rate between $1,400.00 and $3,200.00 throughout his employment.  He regularly worked fifty-five to sixty hours per workweek.  Applying the formulas discussed above, the Court calculates the following hourly rates of pay for Chen:

| Period of Work | Weekly Hours | Monthly Pay | Weekly Pay[33] | Hourly Rate of Pay[34] | Applicable New York Minimum Wage |
|---|---|---|---|---|---|
| September 1, 2014 – December 31, 2014 | 60 | $1,400.00 | $323.08 | $5.38 | $8.00 |
| January 1, 2015 – December 31, 2015 | 60 | $1,400.00 | $323.08 | $5.38 | $8.75 |
| January 1, 2016 – December 31, 2016 | 60 | $1,400.00 | $323.08 | $5.38 | $9.00 |
| January 1, 2017 - December 31, 2017 | 55 | $2,000.00 | $461.54 | $8.39 | $11.00 |
| January 1, 2018 - December 31, 2018 | 55 | $2,900.00 | $669.23 | $12.17 | $13.00 |
| January 1, 2019 - November 30, 2019 | 55 | $2,900.00 | $669.23 | $12.17 | $15.00 |
| December 1, 2019 - March 14, 2020 | 55 | $3,200.00 | $738.46 | $13.43 | $15.00 |

Based on the foregoing, Chen has established that Defaulting Defendants paid him less than minimum wage in violation of the FLSA and NYLL.

### 2.    He

He was initially paid an hourly rate of $10.00 per hour from May 26, 2014 through October 31, 2016. Beginning in November 2016 and continuing through the end of her employment, He was paid a fixed monthly rate and worked an average of sixty hours per week.

Applying the above formulas, the Court calculates the following weekly and hourly rates for He:

---

[33] Monthly rate x 12 (months)/52 (weeks per year).  *See Juan Liu*, 2023 U.S. Dist. LEXIS 87560, at *13; *Gunawan*, 897 F. Supp. 2d at 89. The Court applies the same formula to the remaining Plaintiffs who were paid a fixed monthly rate unless otherwise indicated.

[34] Weekly rate/total hours worked per week.  *See* 29 C.F.R. § 778.109; 12 N.Y.C.R.R. § 142-2.16. The Court applies the same formula to the remaining Plaintiffs who were paid a fixed monthly rate or fixed weekly rate unless otherwise indicated.

| Period of Work | Weekly Hours | Monthly Pay | Weekly Pay | Hourly Rate of Pay[35] | Applicable New York Minimum Wage |
|---|---|---|---|---|---|
| May 26, 2014 - December 30, 2014 | 42.5 | N/A | N/A | $10.00 | $8.00 |
| December 31, 2014 - December 30, 2015 | 42.5 | N/A | N/A | $10.00 | $8.75 |
| December 31, 2015 - October 31, 2016 | 42.5 | N/A | N/A | $10.00 | $9.00 |
| November 1, 2016 - December 30, 2016 | 60 | $2,800.00 | $646.15 | $10.77 | $9.00 |
| December 31, 2016 - April 30, 2017 | 60 | $2,800.00 | $646.15 | $10.77 | $11.00 |
| May 1, 2017 - December 30, 2017 | 60 | $3,500.00 | $807.69 | $13.46 | $11.00 |
| December 31, 2017 - December 30, 2018 | 60 | $3,500.00 | $807.69 | $13.46 | $13.00 |
| December 31, 2018 - December 30, 2019 | 60 | $3,500.00 | $807.69 | $13.46 | $15.00 |
| December 31, 2019 - March 31, 2020 | 60 | $3,500.00 | $807.69 | $13.46 | $15.00 |

Based on the foregoing, He has established that Defaulting Defendants paid her less than minimum wage from December 31, 2018 through March 31, 2020 in violation of the FLSA and NYLL.

### 3.    Jia

Jia was paid on a per-event basis while employed by Defaulting Defendants—$100.00 for a five-hour weeding and $200.00 for ten- or twelve-hour weddings. Jia calculates his average

---

[35] As noted above, the Court calculates He's hourly rate by dividing the weekly rate by the total hours actually worked. In their damages calculations, Plaintiffs calculate He's hourly rate, and several other Plaintiffs' hourly rates, by dividing the weekly rate by 40, which results in inflated hourly wages. This is incorrect, and the Court disregards Plaintiffs' calculations, as reflected on Appendix A. *See Pelico v. SD Auto. Inc.*, No. 21-CV-4215 (ENV) (CLP), 2022 WL 17820136, at *6 n.11 (E.D.N.Y. Aug. 25, 2022) (rejecting plaintiff's contention that his hourly rate should be calculated by dividing his weekly rate by 40 hours per week rather than the total hours worked).

weekly rate as $800.00 during Peak Season and $600.00 during Non-Peak Season.  The Court

calculates the following hourly rates for Jia:

| Period of Work | Weekly Hours | Weekly Pay | Hourly Rate of Pay | Applicable New York Minimum Wage |
|---|---|---|---|---|
| June 1, 2015 - June 30, 2015 | 47 | $600.00 | $12.77 | $8.75 |
| July 1, 2015 - August 21, 2015 | 47 | $600.00 | $12.77 | $8.75 |
| September 1, 2015 - October 31, 2015 | 62 | $800.00 | $12.90 | $8.75 |
| November 1, 2015 - December 30, 2015 | 47 | $600.00 | $12.77 | $8.75 |
| December 31, 2015 - April 30, 2016 | 47 | $600.00 | $12.77 | $9.00 |
| May 1, 2016 - June 30, 2016 | 62 | $800.00 | $12.90 | $9.00 |
| July 1, 2016 - August 31, 2016 | 47 | $600.00 | $12.77 | $9.00 |
| September 1, 2016 - October 31, 2016 | 62 | $800.00 | $12.90 | $9.00 |
| November 1, 2016 - December 30, 2016 | 47 | $600.00 | $12.77 | $9.00 |
| December 31, 2016 - April 30, 2017 | 47 | $600.00 | $12.77 | $11.00 |
| May 1, 2017 - June 30, 2017 | 62 | $800.00 | $12.90 | $11.00 |
| July 1, 2017 - August 31, 2017 | 47 | $600.00 | $12.77 | $11.00 |
| September 1, 2017 - October 31, 2017 | 62 | $800.00 | $12.90 | $11.00 |
| November 1, 2017 - December 30, 2017 | 47 | $600.00 | $12.77 | $11.00 |
| December 31, 2017 - April 30, 2018 | 47 | $600.00 | $12.77 | $13.00 |
| May 1, 2018 - June 30, 2018 | 62 | $800.00 | $12.90 | $13.00 |
| July 1, 2018 - August 31, 2018 | 47 | $600.00 | $12.77 | $13.00 |
| September 1, 2018 - October 31, 2018 | 62 | $800.00 | $12.90 | $13.00 |

| Period of Work | Weekly Hours | Weekly Pay | Hourly Rate of Pay | Applicable New York Minimum Wage |
|---|---|---|---|---|
| November 1, 2018 - December 30, 2018 | 47 | $600.00 | $12.77 | $13.00 |
| December 31, 2018 - April 30, 2019 | 47 | $600.00 | $12.77 | $15.00 |
| May 1, 2019 - June 30, 2019 | 62 | $800.00 | $12.90 | $15.00 |
| July 1, 2019 - August 31, 2019 | 47 | $600.00 | $12.77 | $15.00 |
| September 1, 2019 - October 31, 2019 | 62 | $800.00 | $12.90 | $15.00 |
| November 1, 2019 - December 30, 2019 | 47 | $600.00 | $12.77 | $15.00 |
| December 31, 2019 - March 1, 2020 | 47 | $600.00 | $12.77 | $15.00 |

Based on the foregoing, Jia has established that Defaulting Defendants paid him less than minimum wage for all hours worked after December 30, 2017 in violation of the FLSA and NYLL.

4. **Jin**

Jin received commissions in addition to hourly and flat payrates. Specifically, Jin was paid an hourly rate when she worked in-store and flat-rates when she worked at weddings. Dkt. No. 83-4 ¶¶ 9-10. Jin received commission for every client to whom she sold photo services, but she does not provide any estimate as to how much she earned in commissions each week. Dkt. No. 8 ¶¶ 130, 146. Thus, the Court does not consider Jin's commission for purposes of assessing Defaulting Defendants' minimum wage liability. Based on the information provided by Jin, the Court has calculated the following hourly rates:

| Period of Work | Weekly Hours | Weekly Pay | Hourly Rate of Pay | Applicable New York Minimum Wage |
|---|---|---|---|---|
| June 1, 2015 - June 30, 2015 | 64 | $525.00 | $8.20 | $8.75 |

| Period of Work | Weekly Hours | Weekly Pay | Hourly Rate of Pay | Applicable New York Minimum Wage |
|---|---|---|---|---|
| July 1, 2015 - August 30, 2015 | 64 | $540.00 | $8.44 | $8.75 |
| September 1, 2015 - October 31, 2015 | 74 | $480.00 | $6.49 | $8.75 |
| November 1, 2015 - December 30, 2015 | 64 | $540.00 | $8.44 | $8.75 |
| December 31, 2015 - April 30, 2016 | 64 | $540.00 | $8.44 | $9.00 |
| May 1, 2016 - June 30, 2016 | 74 | $480.00 | $6.49 | $9.00 |
| July 1, 2016 - August 31, 2016 | 64 | $540.00 | $8.44 | $9.00 |
| September 1, 2016 - October 31, 2016 | 74 | $480.00 | $6.49 | $9.00 |
| November 1, 2016 - December 30, 2016 | 64 | $540.00 | $8.44 | $9.00 |
| December 31, 2016 - April 30, 2017 | 64 | $540.00 | $8.44 | $11.00 |
| May 1, 2017 - June 30, 2017 | 74 | $480.00 | $6.49 | $11.00 |
| July 1, 2017 - August 31, 2017 | 64 | $540.00 | $8.44 | $11.00 |
| September 1, 2017 - October 31, 2017 | 74 | $480.00 | $6.49 | $11.00 |
| November 1, 2017 - December 30, 2017 | 64 | $540.00 | $8.44 | $11.00 |
| December 31, 2017 - April 30, 2018 | 64 | $540.00 | $8.44 | $13.00 |
| May 1, 2018 - June 30, 2018 | 74 | $480.00 | $6.49 | $13.00 |
| July 1, 2018 - August 31, 2018 | 64 | $540.00 | $8.44 | $13.00 |
| September 1, 2018 - October 31, 2018 | 74 | $480.00 | $6.49 | $13.00 |
| November 1, 2018 - December 30, 2018 | 64 | $555.00 | $8.67 | $13.00 |
| December 31, 2018 - April 30, 2019 | 64 | $585.00 | $9.14 | $15.00 |
| May 1, 2019 - June 30, 2019 | 74 | $555.00 | $7.50 | $15.00 |

| Period of Work | Weekly Hours | Weekly Pay | Hourly Rate of Pay | Applicable New York Minimum Wage |
|---|---|---|---|---|
| July 1, 2019 - August 31, 2019 | 64 | $585.00 | $9.14 | $15.00 |
| September 1, 2019 - October 31, 2019 | 74 | $555.00 | $7.50 | $15.00 |
| November 1, 2019 - December 30, 2019 | 64 | $585.00 | $9.14 | $15.00 |
| December 31, 2019 - March 1, 2020 | 64 | $585.00 | $9.14 | $15.00 |

Based on the foregoing, Jin has established that she received less than minimum wage in violation of the FLSA and NYLL.

### 5.    Li

Defaulting Defendants paid Li an hourly rate of $11.00 when she worked in-store and a flat-rate when she worked at weddings, consisting of $105.00 for five-hour weddings, $200.00 for ten-hour weddings, and $305.00 for twelve-hour weddings.  Dkt. No. 8 ¶¶ 135-36, 138; Dkt. No. 83-5 ¶¶ 3, 9; Dkt. No. 83-15, at 40.  For the majority of her employment,  Li worked an average of sixty-eight to seventy-two hours per week.  Dkt. No. 8 ¶ 136; Dkt. No. 83-5 ¶ 4.  Based on the information provided by Li, the Court has calculated the following hourly rates:

| Period of Work | Weekly Hours | Weekly Pay | Hourly Rate of Pay | Applicable New York Minimum Wage |
|---|---|---|---|---|
| June 1, 2017 - June 30, 2017 | 72 | $1,484.00 | $20.61 | $11.00 |
| July 1, 2017 - August 31, 2017 | 68 | $1,274.00 | $18.74 | $11.00 |
| September 1, 2017 - October 31, 2017 | 72 | $1,484.00 | $20.61 | $11.00 |
| November 1, 2017 - December 30, 2017 | 68 | $1,274.00 | $18.74 | $11.00 |
| December 31, 2017 - April 30, 2018 | 68 | $1,274.00 | $18.74 | $13.00 |

| Period of Work | Weekly Hours | Weekly Pay | Hourly Rate of Pay | Applicable New York Minimum Wage |
|---|---|---|---|---|
| May 1, 2018 - June 30, 2018 | 72 | $1,484.00 | $20.61 | $13.00 |
| July 1, 2018 - August 31, 2018 | 68 | $1,274.00 | $18.74 | $13.00 |
| September 1, 2018 - October 31, 2018 | 72 | $1,484.00 | $20.61 | $13.00 |
| November 1, 2018 - December 30, 2018 | 68 | $1,274.00 | $18.74 | $13.00 |
| December 31, 2018 - April 30, 2019 | 68 | $1,274.00 | $18.74 | $15.00 |
| May 1, 2019 - June 30, 2019 | 72 | $1,484.00 | $20.61 | $15.00 |
| July 1, 2019 - August 31, 2019 | 68 | $1,274.00 | $18.74 | $15.00 |
| September 1, 2019 - October 31, 2019 | 72 | $1,484.00 | $20.61 | $15.00 |
| November 1, 2019 - December 30, 2019 | 68 | $1,274.00 | $18.74 | $15.00 |
| December 31, 2019 - March 1, 2020 | 68 | $1,274.00 | $18.74 | $15.00 |

Based on the foregoing, Li has failed to establish Defaulting Defendants' minimum wage liability under the FLSA and NYLL because she earned more than minimum wage at all times during her employment.

**6.    Si**

Si was paid an hourly wage. Her hourly rates of pay compared to the then-applicable prevailing minimum wage are as follows:

| Period of Work | Weekly Hours | Hourly Rate of Pay | Applicable New York Minimum Wage |
|---|---|---|---|
| November 1, 2015 - December 31, 2015 | 80.44 | $8.00 | $8.75 |
| January 1, 2016 - December 31, 2016 | 80.44 | $8.00 | $9.00 |
| January 1, 2017 - December 31, 2017 | 80.44 | $10.00 | $11.00 |

| Period of Work | Weekly Hours | Hourly Rate of Pay | Applicable New York Minimum Wage |
|---|---|---|---|
| January 1, 2018 - June 30, 2018 | 80.44 | $10.00 | $13.00 |
| July 1, 2018 - December 31, 2018 | 80.44 | $12.00 | $13.00 |
| January 1,2019 - December 31, 2019 | 80.44 | $12.00 | $15.00 |
| January 1, 2020 - March 14, 2020 | 80.44 | $12.00 | $15.00 |

Based on the foregoing, Si was paid below minimum wage in violation of the FLSA and NYLL.

### 7.    Su

Su received commission in addition to an hourly wage.  From May 26, 2014 through December 31, 2016, Su was paid $7.50 per hour, and from January 1, 2017 through March 15, 2020, she was paid $9.00 per hour.  Su does not indicate, in the Amended Complaint or in her affidavit, how much she earned in commission each week.  Thus, the Court does not consider Su's commission for purposes of assessing Defaulting Defendants' minimum wage liability.  Su's hourly rates of pay compared to the then-applicable prevailing hourly rates are as follows:

| Period of Work | Weekly Hours | Hourly Rate of Pay | Applicable New York Minimum Wage |
|---|---|---|---|
| May 26, 2014 - December 30, 2014 | 60 | $7.50 | $8.00 |
| December 30, 2014 – December 30, 2015 | 60 | $7.50 | $8.75 |
| December 31, 2015 – December 31, 2016 | 60 | $7.50 | $9.00 |
| January 1, 2017 - December 30, 2017 | 60 | $9.00 | $11.00 |
| December 31, 2017 – December 30, 2018 | 60 | $9.00 | $13.00 |
| December 31, 2018 – December 30, 2019 | 60 | $9.00 | $15.00 |

| Period of Work | Weekly Hours | Hourly Rate of Pay | Applicable New York Minimum Wage |
|---|---|---|---|
| December 31, 2019 – March 15, 2020 | 60 | $9.00 | $15.00 |

Based on the foregoing, Su was paid below minimum wage throughout her employment in violation of the FLSA and NYLL.

**8.     Xie**

Xie was paid a fixed monthly rate throughout her employment, ranging from $1,500.00 to $3,200.00.  As noted above, during Peak Wedding Season, Xie worked an average of 120 hours per week, and during Non-Peak Season, Xie worked an average of 96 hours per week.  The Court calculates Xie's hourly rates of pay as follows:

| Period of Hours Worked | Weekly Hours | Monthly Pay | Weekly Pay | Hourly Rate of Pay | Applicable New York Minimum Wage |
|---|---|---|---|---|---|
| May 26, 2014 - June 30, 2014 | 120 | $1,500.00 | $346.15 | $2.88 | $8.00 |
| July 1, 2014 - August 31, 2014 | 96 | $1,500.00 | $346.15 | $3.61 | $8.00 |
| September 1, 2014 - October 31, 2014 | 120 | $1,500.00 | $346.15 | $2.88 | $8.00 |
| November 1, 2014 - December 30, 2014 | 96 | $1,500.00 | $346.15 | $3.61 | $8.00 |
| December 31, 2014 - April 30, 2015 | 96 | $1,500.00 | $346.15 | $3.61 | $8.75 |
| May 1, 2015 - June 30, 2015 | 120 | $2,000.00 | $800.00 | $6.67 | $8.75 |
| July 1, 2015 - August 31, 2015 | 96 | $2,000.00 | $461.54 | $4.81 | $8.75 |
| September 1, 2015 - October 31, 2015 | 120 | $2,000.00 | $461.54 | $3.85 | $8.75 |
| November 1, 2015 - December 30, 2015 | 96 | $2,000.00 | $461.54 | $4.81 | $8.75 |
| December 31, 2015 - April 30, 2016 | 96 | $2,000.00 | $461.54 | $4.81 | $9.00 |

| Period of Hours Worked | Weekly Hours | Monthly Pay | Weekly Pay | Hourly Rate of Pay | Applicable New York Minimum Wage |
|---|---|---|---|---|---|
| May 1, 2016 - June 30, 2016 | 120 | $2,300.00 | $530.77 | $4.42 | $9.00 |
| July 1, 2016 - August 31, 2016 | 96 | $2,300.00 | $530.77 | $5.53 | $9.00 |
| September 1, 2016 - October 31, 2016 | 120 | $2,300.00 | $530.77 | $4.42 | $9.00 |
| November 1, 2016 - December 30, 2016 | 96 | $2,300.00 | $530.77 | $5.53 | $9.00 |
| December 31, 2016 - April 30, 2017 | 96 | $2,300.00 | $530.77 | $5.53 | $11.00 |
| May 1, 2017 - June 30, 2017 | 120 | $2,600.00 | $600.00 | $5.00 | $11.00 |
| July 1, 2017 - August 31, 2017 | 96 | $2,600.00 | $600.00 | $6.25 | $11.00 |
| September 1, 2017 - October 31, 2017 | 120 | $2,600.00 | $600.00 | $5.00 | $11.00 |
| November 1, 2017 - December 30, 2017 | 96 | $2,600.00 | $600.00 | $6.25 | $11.00 |
| December 31, 2017 - April 30, 2018 | 96 | $2,600.00 | $600.00 | $6.25 | $13.00 |
| May 1, 2018 - June 30, 2018 | 120 | $2,600.00 | $600.00 | $5.00 | $13.00 |
| July 1, 2018 - August 31, 2018 | 47 | $3,200.00 | $738.46 | $15.71 | $13.00 |
| September 1, 2018 - October 31, 2018 | 120 | $3,200.00 | $738.46 | $6.15 | $13.00 |
| November 1, 2018 - December 30, 2018 | 96 | $3,200.00 | $738.46 | $7.69 | $13.00 |
| December 31, 2018 - April 30, 2019 | 42 | $3,200.00 | $738.46 | $17.58 | $15.00 |
| May 1, 2019 - June 30, 2019 | 120 | $3,200.00 | $738.46 | $6.15 | $15.00 |
| July 1, 2019 - August 31, 2019 | 96 | $3,200.00 | $738.46 | $7.69 | $15.00 |
| September 1, 2019 - October 31, 2019 | 94 | $3,200.00 | $738.46 | $7.86 | $15.00 |
| November 1, 2019 - December 30, 2019 | 96 | $3,200.00 | $738.46 | $7.69 | $15.00 |

| Period of Hours Worked | Weekly Hours | Monthly Pay | Weekly Pay | Hourly Rate of Pay | Applicable New York Minimum Wage |
|---|---|---|---|---|---|
| December 31, 2019 - March 15, 2020 | 96 | $3,200.00 | $738.46 | $7.69 | $15.00 |

The Court recognizes that Xie's hours during Peak Season are high, considering that 120 hours per week is close to 72 percent of all of Xie's waking hours in a given 168-hour week. Nonetheless, given the current record, the Court concludes that Xie has proven, to a reasonable certainty, that she worked 120 hours per week during Peak Season. *See Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999); *cf. Llolla v. Karen Gardens Apartment Corp.*, No. 12-CV-1356 (MKB) (JO), 2014 WL 1310311, at *3 (E.D.N.Y. Mar. 10, 2014) (concluding that the plaintiff had not proven to a "reasonable certainty" that he worked 168 hours, or even 120 hours, in an average week while in the defendants' employ"), *report and recommendation adopted as modified*, 2014 WL 1311773 (E.D.N.Y. Mar. 28, 2014). Xie provided consistent evidence that "[d]uring the peak season, on average [she] worked on 5 weddings per week, 12 hours each;" she also "need[ed] the same amount of time to edit the film. Therefore, during the peak season, [she] worked 120 hours per week." Dkt. No. 83-7 ¶ 5. In addition, Xie provided calculations that support these hours worked. *See* Dkt. No. 83-15, at 53-70. In the absence of any inconsistencies in Xie's affidavit and calculations, the Court cannot conclude, at this time, that Xie's proffered hours are not reasonably certain for purposes of this instant application. *See Khan v. Young Adult Inst., Inc.*, No. 18-CV-2824 (HBP), 2018 WL 6250658, at *1 (S.D.N.Y. Nov. 29, 2018) (approving FLSA settlement where the plaintiff worked approximately 110 hours per week).

Accordingly, Xie has established that she was paid less than minimum wage throughout her employment in violation of the FLSA and NYLL.

9.     **Yao**

Yao worked an average of sixty-four hours per week during Peak Season and forty-two hours per week during Non-Peak Season.  Defaulting Defendants paid him a fixed monthly rate, ranging from $2,500.00 per month to $3,800.00 per month.  Yao's regular hourly rate of pay was as follows:

| Period Worked | Weekly Hours | Monthly Pay | Weekly Pay | Hourly Rate of Pay | Applicable New York Minimum Wage |
|---|---|---|---|---|---|
| May 26, 2014 - June 30, 2014 | 64 | $2,500.00 | $576.92 | $9.01 | $8.00 |
| July 1, 2014 - August 31, 2014 | 42 | $2,500.00 | $576.92 | $13.74 | $8.00 |
| September 1, 2014 - October 31, 2014 | 64 | $2,500.00 | $576.92 | $9.01 | $8.00 |
| November 1, 2014 - December 30, 2014 | 42 | $2,500.00 | $576.92 | $13.74 | $8.00 |
| December 31, 2014 - April 30, 2015 | 42 | $2,500.00 | $576.92 | $13.74 | $8.75 |
| May 1, 2015 - June 30, 2015 | 64 | $2,500.00 | $800.00 | $12.50 | $8.75 |
| July 1, 2015 - August 31, 2015 | 42 | $2,500.00 | $576.92 | $13.74 | $8.75 |
| September 1, 2015 - October 31, 2015 | 64 | $2,500.00 | $576.92 | $9.01 | $8.75 |
| November 1, 2015 - December 30, 2015 | 42 | $2,500.00 | $576.92 | $13.74 | $8.75 |
| December 31, 2015 - April 30, 2016 | 42 | $2,500.00 | $576.92 | $13.74 | $9.00 |
| May 1, 2016 - June 30, 2016 | 64 | $2,500.00 | $576.92 | $9.01 | $9.00 |
| July 1, 2016 - August 31, 2016 | 42 | $3,600.00 | $830.77 | $19.78 | $9.00 |
| September 1, 2016 - October 31, 2016 | 64 | $3,600.00 | $830.77 | $12.98 | $9.00 |
| November 1, 2016 - December 30, 2016 | 42 | $3,600.00 | $830.77 | $19.78 | $9.00 |
| December 31, 2016 - April 30, 2017 | 42 | $3,600.00 | $830.77 | $19.78 | $11.00 |

| Period Worked | Weekly Hours | Monthly Pay | Weekly Pay | Hourly Rate of Pay | Applicable New York Minimum Wage |
|---|---|---|---|---|---|
| May 1, 2017 - June 30, 2017 | 64 | $3,600.00 | $830.77 | $12.98 | $11.00 |
| July 1, 2017 - August 31, 2017 | 42 | $3,600.00 | $830.77 | $19.78 | $11.00 |
| September 1, 2017 - October 31, 2017 | 64 | $3,600.00 | $830.77 | $12.98 | $11.00 |
| November 1, 2017 - December 30, 2017 | 42 | $3,600.00 | $830.77 | $19.78 | $11.00 |
| December 31, 2017 - April 30, 2018 | 42 | $3,600.00 | $830.77 | $19.78 | $13.00 |
| May 1, 2018 - June 30, 2018 | 64 | $3,600.00 | $830.77 | $12.98 | $13.00 |
| July 1, 2018 - August 31, 2018 | 42 | $3,800.00 | $876.92 | $20.88 | $13.00 |
| September 1, 2018 - October 31, 2018 | 64 | $3,800.00 | $876.92 | $13.70 | $13.00 |
| November 1, 2018 - December 30, 2018 | 42 | $3,800.00 | $876.92 | $20.88 | $13.00 |
| December 31, 2018 - April 30, 2019 | 42 | $3,800.00 | $876.92 | $20.88 | $15.00 |
| May 1, 2019 - June 30, 2019 | 64 | $3,800.00 | $876.92 | $13.70 | $15.00 |
| July 1, 2019 - August 31, 2019 | 42 | $3,800.00 | $876.92 | $20.88 | $15.00 |
| September 1, 2019 - October 31, 2019 | 64 | $3,800.00 | $876.92 | $13.70 | $15.00 |
| November 1, 2019 - December 30, 2019 | 42 | $3,800.00 | $876.92 | $20.88 | $15.00 |
| December 31, 2019 - March 15, 2020 | 42 | $3,800.00 | $876.92 | $20.88 | $15.00 |

Based on the foregoing, Yao has established that Defaulting Defendants failed to pay him minimum wage in violation of the FLSA and NYLL.

### 10.    Zheng

Zheng's hours varied each week, and he was paid a fixed monthly wage of $3,600.00 per month.  The Court has calculated the following hourly rates for Zheng:

| Period Worked | Weekly Hours | Monthly Pay | Weekly Pay | Hourly Rate of Pay | Applicable New York Minimum Wage |
|---|---|---|---|---|---|
| July 1, 2018 - August 31, 2018 | 33 | $3,600.00 | $830.77 | $25.17 | $13.00 |
| September 1, 2018 - November 30, 2018 | 46.5 | $3,600.00 | $830.77 | $17.87 | $13.00 |
| December 1, 2018 - December 31, 2018 | 33 | $3,600.00 | $830.77 | $25.17 | $13.00 |
| January 1, 2019 - February 28, 2019 | 20 | $3,600.00 | $830.77 | $41.54 | $15.00 |
| March 1, 2019 - March 31, 2019 | 46.5 | $3,600.00 | $830.77 | $17.87 | $15.00 |
| April 1, 2019 - July 31, 2019 | 55.5 | $3,600.00 | $830.77 | $14.97 | $15.00 |
| August 1, 2019 - August 31, 2019 | 33 | $3,600.00 | $830.77 | $25.17 | $15.00 |
| September 1, 2019 - November 30, 2019 | 46.5 | $3,600.00 | $830.77 | $17.87 | $15.00 |
| December 1, 2019 - December 31, 2019 | 33 | $3,600.00 | $830.77 | $25.17 | $15.00 |
| January 1, 2020 - February 29, 2020 | 20 | $3,600.00 | $830.77 | $41.54 | $15.00 |
| March 1, 2020 - March 15, 2020 | 46.5 | $3,600.00 | $830.77 | $17.87 | $15.00 |

Based on the foregoing, Zheng has established that Defaulting Defendants paid him less than minimum wage in April 2019 through July 2019 in violation of the FLSA and NYLL.

**11.    Zhu**

During Peak Season, Zhu worked an average of sixty-four hours per week, and during Non-Peak Season, he worked an average of forty-two hours per week. Zhu received a fixed monthly wage, ranging from $1,300.00 per month to $2,300.00. The Court has calculated the following hourly rates of pay:

| Period of Hours Worked | Weekly Hours | Monthly Pay | Weekly Pay | Hourly Rate of Pay | Applicable New York Minimum Wage |
|---|---|---|---|---|---|
| March 1, 2017 - March 31, 2017 | 42 | $1,300.00 | $300.00 | $7.14 | $11.00 |
| April 1, 2017 - April 30, 2017 | 42 | $1,500.00 | $346.15 | $8.24 | $11.00 |
| May 1, 2017 - June 30, 2017 | 64 | $1,500.00 | $346.15 | $5.41 | $11.00 |
| July 1, 2017 - August 31, 2017 | 42 | $1,500.00 | $346.15 | $8.24 | $11.00 |
| September 1, 2017 - October 31, 2017 | 64 | $1,500.00 | $346.15 | $5.41 | $11.00 |
| November 1, 2017 - December 31, 2017 | 42 | $1,500.00 | $346.15 | $8.24 | $11.00 |
| January 1, 2018 - April 30, 2018 | 42 | $1,500.00 | $346.15 | $8.24 | $13.00 |
| May 1, 2018 - June 30, 2018 | 64 | $1,500.00 | $346.15 | $5.41 | $13.00 |
| July 1, 2018 - August 31, 2018 | 42 | $1,500.00 | $346.15 | $8.24 | $13.00 |
| September 1, 2018 - October 31, 2018 | 64 | $1,500.00 | $346.15 | $5.41 | $13.00 |
| November 1, 2018 - December 31, 2018 | 42 | $1,500.00 | $346.15 | $8.24 | $13.00 |
| January 1, 2019 - April 30, 2019 | 42 | $1,500.00 | $346.15 | $8.24 | $15.00 |
| May 1, 2019 - June 30, 2019 | 64 | $1,500.00 | $346.15 | $5.41 | $15.00 |
| July 1, 2019 - August 31, 2019 | 42 | $2,300.00 | $530.77 | $12.64 | $15.00 |
| November 1, 2019 - March 15, 2020 | 42 | $2,300.00 | $530.77 | $12.64 | $15.00 |

Based on the foregoing, Zhu has established that he was paid less than minimum wage in violation of the FLSA and NYLL.

*   *   *

In sum, Plaintiffs Chen, He, Jia, Jin, Si, Su, Xie, Yao, Zheng, and Zhu have established that Defaulting Defendants paid them less than minimum wage. Plaintiff Li has not established Defaulting Defendants' minimum wage liability under the FLSA or NYLL.

**B.    Failure to Pay Overtime**

Both the FLSA and NYLL require employers to pay overtime wages equal to one and one-half an employee's regular salary for every hour worked in excess of forty hours in any given week. *See* 29 U.S.C. § 207(a); NYLL § 651; 12 N.Y.C.R.R § 142-2.2. As explained below, each Plaintiff has established that they were not paid overtime compensation for the hours they worked in excess of forty hours each workweek.

**1.    Chen**

From September 1, 2014 through December 31, 2016, Chen worked an average of twenty hours of overtime each week. *See* Dkt. No. 83-15, at 103-07. From January 1, 2017 through March 14, 2020, he worked an average of fifteen hours of overtime each week. *Id.* Chen claims that Defaulting Defendants did not compensate him for these overtime hours. Dkt. No. 83-12 ¶ 10. Chen has established Defaulting Defendants' liability for overtime compensation under the FLSA and NYLL.

**2.    He**

From May 26, 2014 through October 31, 2016, He worked an average of 2.5 overtime hours each week. *See* Dkt. No. 83-15, at 7-12. Defaulting Defendants did not pay her the overtime rate of $15.00 per hour, but instead paid He her regular hourly rate of pay of $10.00. *Id.* From November 1, 2016 through March 31, 2020, He worked an average of twenty hours of overtime per week. *See* id. He claims that Defaulting Defendants did not compensate her for these overtime

hours. *Id*. He has established Defaulting Defendants' liability for overtime compensation under the FLSA and NYLL.

### 4. Jia

Jia regularly worked seven or twenty-two hours of overtime per week, depending on whether it was peak wedding months. *See* Dkt. No. 83-15, at 12-26. Jia claims that Defaulting Defendants did not compensate him for these overtime hours. *Id*. He has established Defaulting Defendants' liability for overtime compensation under the FLSA and NYLL.

### 4. Jin

Jin regularly worked twenty-four to thirty-four hours of overtime per week. Dkt. No. 83-15, at 26-40. She claims that she did not receive overtime pay for these hours. *Id.* Accordingly, Jin has established Defaulting Defendants' liability for overtime compensation under the FLSA and NYLL.

### 5. Li

Li regularly worked twenty-eight to thirty-two hours of overtime per week. Dkt. No. 83-15, at 40-48. Li claims that she was paid the same hourly rate regardless of her overtime hours. *Id.* Accordingly, Li has established Defaulting Defendants' liability for overtime compensation under the FLSA and NYLL.

### 6. Si

Si claims to have worked an average of 40.44 hours of overtime each week. *See* Dkt. No. 83-15, at 98 n.23. Defaulting Defendants did not pay Si her overtime rate of pay for these hours, but instead paid Si her regular hourly rate of pay. *See id.* at 98-103. Si has established Defaulting Defendants' liability for overtime compensation under the FLSA and NYLL.

### 7.    Su

Su worked an average of twenty hours of overtime each week.  *See* Dkt. No. 83-15, at 48-53.  Defaulting Defendants did not pay Su her overtime rate of pay for these hours but instead paid her at her regular hourly rate of pay.  *See id.*  Su has established Defaulting Defendants' liability for overtime compensation under the FLSA and NYLL.

### 8.    Xie

Xie worked various amounts of overtime each week—sometimes working as many as fifty-six overtime hours, and other weeks working only two.  Dkt. No. 83-15, at 53-70.  Xie claims that Defaulting Defendants did not compensate her for these overtime hours.  *Id.*  Xia has therefore established Defaulting Defendants' liability for overtime compensation under the FLSA and NYLL.

### 9.    Yao

Yao worked two or twenty-four hours of overtime per week, depending on whether it was wedding season.  *Id.* at 73-86.  Yao claims that Defaulting Defendants did not compensate him for these overtime hours.  *Id.*  Yao has therefore established Defaulting Defendants' liability for overtime compensation under the FLSA and NYLL.

### 10.    Zheng

Zheng worked two to twenty-four hours of overtime per week, depending on whether it was wedding season.  *Id.* at 86-92.  Zheng claims that Defaulting Defendants did not compensate him for these overtime hours.  *Id.*  Zheng has therefore established Defaulting Defendants' liability for overtime compensation under the FLSA and NYLL.

### 11. Zhu

Zhu worked two or twenty-four hours of overtime per week, depending on whether it was wedding season.  *Id.* at 92-103.  Zhu claims that Defaulting Defendants did not compensate him for these overtime hours.  *Id.*  Zhu has therefore established Defaulting Defendants' liability for overtime compensation under the FLSA and NYLL.

### C.    Failure to Pay Spread-of-Hours Pay

Under the NYLL, an employee is entitled to earn an additional hour of pay at the minimum wage for each day on which that employee works more than ten hours.  12 N.Y.C.R.R. § 142-2.4.  Only employees who make minimum wage or less are eligible for spread of hours pay.  *Id.*; *see also Fermin*, 93 F. Supp. 3d at 45-46 ("A limitation upon a plaintiff's eligibility to recover for spread-of-hours is that the plaintiff not earn more than the minimum wage.").

Here, only Chen, Si, Su, Zheng, and Zhu seek spread of hours pay.  Each of these Plaintiffs claim that they regularly worked more than ten-hour days but did not receive spread of hours pay.  Because each of these Plaintiffs earned less than minimum wage during certain periods, they are entitled to spread of hours compensation for each day in which they worked more than ten hours during those periods pursuant to 12 N.Y.C.R.R. § 142-2.4.

## VI.    Plaintiffs' Wage Statement and Wage Notice Claims

NYLL § 195(1) requires employers to provide employees at the time of hire with a wage notice containing, *inter alia*, the rate of pay, the basis thereof, and pay schedule.  NYLL § 195(3) requires employers to provide employees with "a statement with every payment of wages," listing various information including the dates of work covered by the payment, information identifying the employer and employee, details regarding the rate of pay and the overtime rate of pay, and the number of hours worked.

Plaintiffs allege that Defaulting Defendants violated both provisions because they did not receive a wage notice at the time they were hired in English and their primary language, Chinese. Plaintiffs also allege that they did not receive written wage statements with their pay. While Plaintiffs allege statutory violations by Defaulting Defendants, Plaintiffs do not plead sufficient facts to establish Article III standing and therefore cannot recover on these claims.

"The requirements of Article III standing are well established: '[A] plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Lacewell v. Off. of Comptroller of Currency*, 999 F.3d 130, 141 (2d Cir. 2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). Importantly, "a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). This includes claims over which the court has supplemental jurisdiction, even where the plaintiff has standing to bring jurisdiction-invoking federal claims. *See id.* at 351–52.

The Supreme Court "has rejected the proposition that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021) (quoting *Spokeo*, 578 U.S. at 341). "Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* Where the plaintiff does not establish a concrete injury fairly traceable to the statutory violation, the plaintiff lacks Article III standing and, in turn, the district court lacks subject matter jurisdiction to enter default judgment. *See, e.g.*, *Sevilla v. House of Salads One LLC*, No. 20-CV-6072 (PKC) (CLP), 2022 WL 954740, at *7 (E.D.N.Y. Mar. 30, 2022). As a result, courts in this Circuit have found allegations of technical violations NYLL § 195(1) and §

195(3) to be insufficient, on their own, to confer Article III standing.  *See, e.g.*, *Proano v. Melrose Home Improvement Corp.*, No. 22-CV-6050 (KM), 2023 WL 8003303, at *4 (E.D.N.Y. Nov. 17, 2023) (holding that the Court lacked subject matter jurisdiction over Plaintiffs' NYLL § 195(1) and (3) claims because "Plaintiffs did not link any legally cognizable injury that they personally experienced to Defendants' failure to provide wage statements and wage notices under the NYLL"); *Wang v. XBB, Inc.*, No. 18-CV-7341 (PKC) (ST), 2022 WL 912592, at *13 (E.D.N.Y. Mar. 29, 2022) ("Plaintiff has not linked any injury-in-fact to Defendants' failure to provide statutory notices under the NYLL, so she lacks standing to recover on that claim.").

In this case, Plaintiffs have neither plead, nor established via their affidavits and declarations, that they suffered a concrete injury resulting from Defaulting Defendants' alleged failure to provide them with wage notices or statements.  Instead, Plaintiffs merely allege that Defaulting Defendants failed to provide them with wage notice and wage statements, averring that these failures entitle them to statutory damages.  *See* Dkt. No. 8 ¶¶ 252-60.

Absent any factual allegations of a concrete injury fairly traceable to Defaulting Defendants' failure to provide wage notices or wage statements, Plaintiffs' claims, as alleged in the Amended Complaint, do not demonstrate Article III standing.  Consequently, the Court respectfully recommends denying Plaintiffs' request for a default judgment on their wage notice and wage statement claims and dismissing the claims for lack of subject matter jurisdiction.  *See Sevilla*, 2022 WL 954740, at *7; *see also Beh v. Cmty. Care Companions Inc.*, 19-CV-1417 (JLS) (MJR), 2022 WL 5039391, at *7-8 (W.D.N.Y. Sept. 29, 2022); *Metcalf v. TransPerfect Translations Int'l, Inc.*, 19-CV-10104 (ER), 632 F. Supp. 3d 319, 338-41 (S.D.N.Y. Sept. 30, 2022).

## **DAMAGES**

As Defaulting Defendants' liability has been established, the Court turns to evaluate damages. "While a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages." *Greyhound Exhibitgroup, Inc.*, 973 F.2d at 158. "Rather, the Court must be satisfied that Plaintiff has met the burden of proving damages to the Court with reasonable certainty." *Balhetchet v. Su Caso Mktg. Inc.*, No. 19-CV-4475 (PKC) (SJB), 2020 WL 4738242, at *3 (E.D.N.Y. Aug. 14, 2020) (cleaned up). A plaintiff may submit documentary evidence or detailed affidavits to support their damages claim, and the Court may award damages based on the plaintiff's recollection and estimate of hours worked, which are presumed to be correct as a result of the defendant's default. *See, e.g.*, *Brito v. Marina's Bakery Corp.*, No. 19-CV-00828 (KAM) (MMH), 2022 WL 875099, at *15 (E.D.N.Y. Mar. 24, 2022) (collecting cases); *Lopez v. Royal Thai Plus, LLC*, No. 16-CV-4028 (NGG) (SJB), 2018 WL 1770660, at *9 (E.D.N.Y. Feb. 6, 2018) (a plaintiff "need not compute FLSA damages with precision"), *report and recommendation adopted*, 2018 WL 1770555 (E.D.N.Y. Apr. 12, 2018).

Here, because Defaulting Defendants have defaulted and no employment records have been produced, the Court will presume the accuracy of Plaintiffs' recollection and estimates of hours worked set forth in their affidavits and damages calculations.[36] *See Sanchez v. Ms. Wine Shop Inc.*, 643 F. Supp. 3d 355, 375 (E.D.N.Y. 2022) (calculating damages owed "based partially on the representations" in the complaint as well as plaintiff's damages spreadsheet); *Jin Li v. W.*

---

[36] The Court has nonetheless reviewed the accuracy of Plaintiffs' counsel's calculations and has found many mathematical discrepancies, as explained herein and in Appendix A. Most notably, Plaintiffs seek a total award of $2,763,679.33 (Dkt. No. 83-15, at 1; Dkt. No. 84), yet even if the Court accepted Plaintiffs' top-line numbers for their "unpaid back wages," "NYS liquidated damages," and "wage notice + wage statement" damages, the total damages would be $3,724,198.32, not $2,763,679.33.

*Metal Work & Supply, Inc.*, No. 17-CV-1015 (JBW) (RML), 2019 WL 2436275, at *4 (E.D.N.Y. Feb. 27, 2019) (relying on the plaintiff's recollection of hours worked and wages paid in order to calculate damages).  Furthermore, because Plaintiffs cannot recover under both the FLSA and NYLL for the same injury, the Court calculates damages under the NYLL, which provides for the greatest recovery.  *See Diaz v. Rene French Cleaners, Inc.*, No. 20-CV-3848 (RRM) (RER), 2022 WL 4646866, at *6 (E.D.N.Y. Aug. 29, 2022), *report and recommendation adopted*, 2022 WL 4662247 (Sept. 30, 2022).

Finally, as noted above, and as Plaintiffs explained to Judge Kovner, Cao returned to China and did not appear at the trial in this action.  While Plaintiffs seek damages on behalf of Cao (Dkt. No. 83-15, at 1), they  do not submit an affidavit or declaration from Cao with their motion. Plaintiff Su attests to Cao's regular hours and rate of pay in her affidavit, claiming that as Cao's colleague, she has personal knowledge of her hours and pay.  *See* Dkt. No. 83-6 ¶¶ 14, 20-21.  Su's statements about Cao are inadmissible and disregarded by the Court.  *See Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 154-55 (2d Cir. 1999) (holding that district court should not have considered statements in affidavit made by someone without personal knowledge); *Upstate New York Carpenters Pension Fund v. MBE Grp., Inc.*, No. 08-CV-00129 (NAM) (GHL), 2009 WL 10680307, at *4 (N.D.N.Y. Sept. 28, 2009) ("The Court finds these conclusory assertions to be insufficient evidence of damages.  An affidavit made on hearsay is not made on "personal knowledge.").  Besides the lack of evidence, Cao was already dismissed from this case after having effectively abandoned this litigation.  Accordingly, this Court recommends that Plaintiffs are not awarded any damages on behalf of Cao.

The Court also recognizes Judge Mann's finding in her October 14, 2022 report and recommendation that Defaulting Defendants were "*out of business and presumably judgment-*

*proof*." *See* Dkt. No. 66, at 6 (emphasis added) (citing Dkt. No. 8 ¶ 101). Plaintiffs provide no indication that Defaulting Defendants are back in business or that there is a likelihood of any recovery for Plaintiffs here. Nonetheless, the Court evaluates the damages award below.

## I.    Unpaid Wage Claims

To calculate Plaintiffs' damages for their underpayment of minimum wage, the difference between the applicable minimum wage and each Plaintiff's hourly pay rate is multiplied by forty – the number of hours for which each Plaintiff should have been paid minimum wage. *See Guthrie v. Rainbow Fencing Inc.*, No. 21-CV-5929 (KAM) (RML), 2022 WL 18999832, at *5 (E.D.N.Y. Dec. 13, 2022), *report and recommendation adopted*, 2023 WL 2206568 (E.D.N.Y. Feb. 24, 2023). That number is then multiplied by the number of weeks in which the Plaintiff worked during the time periods at issue to determine the total amount of minimum wages owed to the Plaintiff. Based on the calculations in Appendix A, this Court respectfully recommends that Plaintiffs be awarded $224,428.32 for unpaid minimum wages and $43,471.58 for wage payments that Plaintiffs never received at the end of their employment.

To calculate Plaintiffs' overtime compensation, the number of hours each Plaintiff worked over forty per week is multiplied by 150 percent of the higher of their regular rate of pay, or the applicable minimum wage. *See Guthrie*, 2022 WL 18999832, at *5. This results in the amount of overtime compensation owed to plaintiff on a weekly basis. *Id.* To obtain the total overtime compensation owed for each period, the weekly amount owed is multiplied by the number of weeks in that period. *Id.* Based on the calculations in Appendix A, this Court respectfully recommends that Plaintiffs be awarded $955,311.80 for unpaid overtime wages.

To calculate spread-of-hour damages, the Court multiplies the minimum wage for the relevant period by the total number of days that the employee worked more than ten hours per day.

12 N.Y.C.R.R. § 142-2.4.  Based on the calculations in the Appendix A, this Court respectfully recommends that Plaintiffs be awarded $63,345.38 for spread-of-hour damages.

## II.    Liquidated Damages

Both the FLSA and NYLL allow for liquidated damages awards equaling 100 percent of the wages due.  *See* 29 U.S.C. § 216(b); NYLL § 663(1).  Under the FLSA, "a district court is generally required to award a plaintiff liquidated damages equal in amount to the unpaid minimum or overtime wages."  *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 150 (2d Cir. 2008).  Courts may, however, decline to award liquidated damages where employers "show[] to the satisfaction of the court" that they acted in good faith and reasonably believed they did not violate the FLSA.  *See* 29 U.S.C. § 260.

The NYLL similarly permits employees to recover "an additional amount as liquidated damages equal to one hundred percent of the total of such underpayments found to be due" unless the employer provides "a good faith basis to believe that its underpayment of wages was in compliance with the law."  NYLL § 663(1).  Because "there are no meaningful differences" between the liquidated damages provisions of the FLSA and NYLL, the Second Circuit has interpreted the two statutes "as not allowing duplicative liquidated damages for the same course of conduct."  *Rana v. Islam*, 887 F.3d 118, 123 (2d Cir. 2018).  "In light of the principle that the law providing the greatest recovery will govern, [a] [p]laintiff may be awarded liquidated damages pursuant to the NYLL or the FLSA."  *Jian Hua Li v. Chang Lung Grp. Inc.*, No. 16-CV-6722 (PK), 2020 WL 1694356, at *14 (E.D.N.Y. Apr. 7, 2020) (quotations and citation omitted).

Here, Plaintiffs' recovery for liquidated damages is the same under both the FLSA and the NYLL.  And due to their default, Defaulting Defendants have failed to make a showing of good faith.  *See Lu Nan Fan v. Jenny & Richard's Inc.*, No. 17-CV-6963 (WFK), 2019 WL 1549033, at

*11 (E.D.N.Y. Feb. 22, 2019) ("As a result of defendants' default in this action, the record is devoid of evidence of their good faith or reasonable belief."), *report and recommendation adopted*, No. 17-CV-6963 (WFK), 2019 WL 1547256 (E.D.N.Y. Apr. 9, 2019); *Peralta v. M & O Iron Works, Inc.*, No. 12-CV-3179 (ARR) (RLM), 2014 WL 988835, at *10 (E.D.N.Y. Mar. 12, 2014) ("Obviously, as a result of defendants' default in this action, the record is devoid of evidence of defendants' good faith or reasonable belief. Therefore, the Court recommends that liquidated damages be awarded under the FLSA."); *Gunawan*, 897 F. Supp. 2d at 91 ("Where, as here, a defendant employer has defaulted, the court plainly cannot find that it has made the showing of good faith necessary to defeat an award of liquidated damages.").  Plaintiffs are therefore entitled to 100 percent of their underpaid wages found to be due.

Based on the calculations in Appendix A, this Court respectfully recommends that Plaintiffs are awarded $2,573,114.16 in liquidated damages.

## III.  Attorneys' Fees

"Both the FLSA and NYLL are fee-shifting statutes which entitle a plaintiff to an award of reasonable attorney's fees and costs in wage-and-hour actions."  *Callari v. Blackman Plumbing Supply, Inc.*, No. 11-CV-3655 (ADS) (AKT), 2020 WL 2771008, at *6 (E.D.N.Y. May 4, 2020), *report and recommendation adopted*, 2020 WL 2769266 (E.D.N.Y. May 28, 2020).  "District courts have broad discretion to determine the amount of attorneys' fees awarded, and the party requesting fees must submit documentation to support its request."  *Perry v. High Level Dev. Contracting & Sec. LLC*, No. 12-CV-2180 (AMD) (PK), 2022 WL 1018791, at *14 (E.D.N.Y. Mar. 16, 2022), *report and recommendation adopted*, 2022 WL 1017753 (E.D.N.Y. Apr. 5, 2022).

"The starting point for determining the presumptively reasonable fee award is the lodestar amount, which is the product of a reasonable hourly rate and the reasonable number of hours

required by the case." *Hennessy v. 194 Bedford Ave Rest. Corp.*, No. 21-CV-5434 (FB)(RML), 2022 WL 4134502, at *6 (E.D.N.Y. Aug. 8, 2022) (internal citations and quotation marks omitted), *report and recommendation adopted*, 2022 WL 4134437 (E.D.N.Y. Sept. 12, 2022). "To determine a reasonable hourly rate, courts consider market rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Id.* (cleaned up). "If the Court finds that some of the time the attorney billed was not reasonably necessary, it should reduce the time for which compensation is awarded accordingly." *Perry*, 2022 WL 1018791, at *14 (cleaned up). Where time entries are vague, duplicative, or otherwise inadequate, a court may make an across-the-board reduction or percentage cut, in the amount of hours. *Id.* "The applicant bears the burden to demonstrate reasonableness." *Sadowski v. Yeshiva World News, LLC*, No. 21-CV-7207 (AMD) (MMH), 2023 WL 2707096, at *8 (E.D.N.Y. Mar. 16, 2023), *report and recommendation adopted*, 2023 WL 2742157 (E.D.N.Y. Mar. 31, 2023).

### A.    Hourly Rate

Plaintiffs seek an award of attorneys' fees based on the following hourly rates: $375.00 per hour for Jian Hang,[37] principal attorney at Hang & Associates, PLLC, and Ge Qu, senior attorney at Hang & Associates, PLLC; $325.00 per hour for Ziyi Gao and Zhangyuxi Wang, associate attorneys at Hang & Associates, PLLC; $300.00 per hour for Jiajing Fan; and $150.00 per hour for Ge Yan, a law clerk at Hang & Associates, PLLC. *See* Dkt. No. 85. Hang has practiced law for almost ten years and has practiced almost exclusively in this area. Dkt. No. 85 ¶ 212. Ge Qu has practiced law since 2015 and has focused on FLSA matters since June 2017. *Id.* ¶ 216. Gao does not indicate when she graduated law school, but she claims she has handled wage-and-hour

---

[37] Upon review of the billing entries (Dkt. No. 83-16), it appears that Hang did not bill time to this matter.

claims since 2021.  *Id.* ¶ 219.  Plaintiffs provide no information about Fan, Wang, Yan, or Zang's backgrounds or credentials.  *See* Dkt. No. 85.

"Courts in the Eastern District have recently awarded hourly rates ranging from $300 to $450 for partners, $200 to $325 for senior associates, $100 to $200 for junior associates, and $70 to $100 for legal support staff in FLSA cases."  *Esquivel*, 2023 WL 6338666, at *17 (quoting *Diaz*, 2022 WL 4646866, at *13).  Indeed, courts have awarded similar awards for the same attorneys and firm litigating the instant case.  *See, e.g., Li v. HLY Chinese Cuisine Inc.*, 596 F. Supp. 3d 439, 452 (E.D.N.Y. 2022) (finding hourly rates of "$150 and $250 for law clerks and $300 for associates" at Hang & Associates to be reasonable, especially where the attorneys "have extensive experience litigating wage and hour claims and fluency in several languages that facilitate communications with their target clients."); *Gao v. Jian Song Shi*, No. 18-CV-2708 (ARR)(LB), 2021 WL 1949275, at *18 (E.D.N.Y. Apr. 30, 2021) (approving similar rates as requested here), *report and recommendation*, 2021 WL 1946322 (E.D.N.Y. May 15, 2021).

Based on the foregoing, the Court finds Qu's hourly rate reasonable.  The Court recommends reducing Gao's rate to $300.00 per hour, which is in line with the associate rates awarded in this district.  Lastly, the Court recommends not awarding fees for Fan, Wang, Yan, or Zang as the Court was not provided with sufficient information to assess the reasonableness of their hourly rates.

### B.   Reasonable Number of Hours

Next, the court must determine the reasonableness of the number of hours expended by counsel.  *Martinez v. New 168 Supermarket LLC*, No. 19-CV-4526 (CBA) (SMG), 2020 WL 5260579, at *9 (E.D.N.Y. Aug. 19, 2020), *report and recommendation adopted*, 2020 WL 5259056 (Sept. 30, 2020).  Courts examine the contemporaneous time records to exclude what

appears to be excessive or unnecessary hours and "with a view to the value of the work product of the specific expenditures to the client's case." *Id.* (citations and quotations omitted). In determining the reasonable number of hours required by a case, the critical issue is "whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir.1992). If the Court finds that some of the claimed hours are "excessive, redundant or otherwise unnecessary," it may reduce the number of reasonable hours accordingly. *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 426 n.6 (2d Cir. 1999).

Among other reasons for reduction or denial of fees, "[a]n attorney is not entitled to fees arising from claims against other unrelated defendants." *Laboratorios Rivas, SRL v. Ugly & Beauty, Inc.*, No. 11-CV-5980 (RA) (JLC), 2013 WL 5977440, at *15 (S.D.N.Y. Nov. 12, 2013), *report and recommendation adopted*, 2014 WL 112397 (S.D.N.Y. Jan. 8, 2014); *Lucerne Textiles v. H.C.T. Textiles Co.*, No. 11–CV–5456 (KMW) (AJP), 2013 WL 174226, at *9 (S.D.N.Y. Jan. 17, 2013) ("[The defaulting defendant] is not responsible for fees related to [plaintiff's] claims against other parties and, therefore, these entries warrant a reduction."), *report and recommendation adopted*, 2013 WL 1234911 (S.D.N.Y. Mar. 26 2013); *Colon v. City of New York*, No. 09-CV-8 (JBW) (CLP), 2012 WL 691544, at *22 (E.D.N.Y. Feb. 9, 2012) (recommending denial of fees for tasks unrelated to plaintiff's case against the defaulting defendants), *report and recommendation adopted*, 2012 WL 686878 (E.D.N.Y. Mar. 2, 2012); *Williamsburg Fair Hous. Comm. v. RossRodney Hous. Corp.*, 599 F.Supp. 509, 514 (S.D.N.Y. 1984) ("Where there are multiple defendants, each defendant must bear the prevailing plaintiff's fees for time spent on matters clearly related to the claims made against that defendant.").

Plaintiffs are only entitled to the attorneys' fees that they incurred in connection with their claims against the Defaulting Defendants specifically. Thus, Plaintiffs can recover their fees in

connection with preparing the Complaint, Amended Complaint, their first motion for default judgment, and the instant motion.  To the extent that Plaintiffs' entries are block billed or fail to distinguish their work directly relating to Defaulting Defendants from work related to other defendants, those entries should not be included in the award.  Plaintiffs should also not recover for tasks that only became necessary due to Plaintiffs' own delay, such as responding to the Court's May 23, 2022 order to show cause.  Indeed, it would be incomprehensible for Plaintiffs to recover fees for work associated with their failure to comply with the Court's February 16, 2022 order, which ultimately resulted in a Court-ordered sanction of Plaintiffs' counsel for $500.00.  *See* May 27, 2022 Dkt. Order.  For example, Plaintiffs' counsel billed no hours after the February 16, 2022 conference until May 9, 2022, when the Court issued the order to show cause in light of Plaintiffs not meeting the default judgment deadline.  *See* Dkt. No. 83-16, at 18-20.  Then, between May 9, 2022 and May 27, 2022, when the Court sanctioned Plaintiffs' counsel for, once again, not meeting the Court-ordered default judgment deadline, Plaintiffs' counsel billed over twenty-five hours.  *Id.* Had Plaintiffs' counsel met the original deadline, they could have been more efficient with their billing.

In light of these considerations, the Court recommends an across-the-board reduction of 20% of Plaintiffs' requested fees.  *See Ally Fin. Inc. v. Comfort Auto Grp. NY LLC*, No. 20-CV-1281 (MKB) (RLM), 2022 WL 3703955, at *22 (E.D.N.Y. Aug. 26, 2022) ("In dealing with such surplusage, the court has discretion simply to deduct a reasonable percentage of the number of hours claimed 'as a practical means of trimming fat from a fee application.'" (cleaned up)), *report and recommendation adopted*, 2022 WL 4813505 (E.D.N.Y. Oct. 3, 2022); *see also Laboratorios*, 2013 WL 5977440, at *17 (recommending a 10 percent deduction of fees because it was "unclear exactly how many defendants were the subject of counsels' activities during the various billing

stages of this case (due in large part to the vagueness of the billing records), and Plaintiff's counsel has not parsed the billing records in its submissions to the Court to shed any light on this subject"); *Quinn v. Nassau City Police Dep't.*, 75 F. Supp. 2d 74, 78 (E.D.N.Y. 1999) (reducing one attorney's fees by 20 percent and another attorney's fees by 30 percent for unnecessary and redundant time); *American Lung Ass'n v. Reilly*, 144 F.R.D. 622, 627 (E.D.N.Y. 1992) (applying 40 person reduction in fees).

Accordingly, this Court respectfully recommends that Plaintiffs are awarded $48,024.00 in attorneys' fees, comprising: (1) Qu's 56.5 hours at $325.00 per hour = $18,330.00; (2) Gao's 139 hours at $300.00 per hour = $41,700.00; and (3) a 20% deduction of $12,006.00.

## IV.    Costs

When a party is awarded attorneys' fees, it is also entitled to compensation for "those reasonable out-of-pocket expenses incurred by attorney and ordinarily charged to then clients." *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998) (quotations omitted).  To recover these costs, Plaintiffs are required to "submit adequate documentary evidence in support." *Tacuri v. Nithin Constr. Co.*, No. 14-CV-2908 (CBA) (RER), 2015 WL 790060, at *14 (E.D.N.Y. Feb. 24, 2015).

Plaintiffs seek to recover $400.00 for an ECF filing fee; $285.00 for "settlement conference translation fees"; $380.00 for "translation fees for depositions"; $877.95 for "deposition cost"; $400.00 for "filing fees"; and $1,826.00 for "service fees."  Dkt. No. 83-16.  Plaintiffs do not, however, provide any backup documentation to substantiate these costs.  Without such backup documentation, Plaintiffs are not entitled to an award of costs except for the $400.00 filing fee, which is recoverable because the docket indicates the filing fee was paid.  *See* May 26, 2020 Dkt. Entry; *see also Shalto v. Bay of Bengal Kabob Corp.*, No. 12-CV-920 (KAM) (VMS), 2013 WL

867420, at *2 (E.D.N.Y. Mar. 7, 2013) (holding that filing fees are recoverable without supporting documentation if verified by the docket).

Accordingly, the undersigned respectfully recommends that Plaintiffs are awarded only $400.00 in costs.

## V.    Pre-judgment Interest

Under the NYLL, Plaintiffs are entitled to pre-judgment interest on all unpaid wages at a statutory rate of nine percent.  NYLL § 198(1-a); CPLR §§ 5001(b), 5004.  "Prejudgment interest is calculated on the unpaid wages due under the NYLL, not on the liquidated damages awarded under the state law."  *Fermin*, 93 F. Supp. 3d at 49 (internal quotations omitted).  Courts have "wide discretion in determining a reasonable date from which to award pre-judgment interest."  *Conway v. Icahn & Co.*, 16 F.3d 504, 512 (2d Cir. 1994).  Most courts in this district calculate simple pre-judgment interest in NYLL actions from the midpoint date of the claims through the date judgment is entered.  *Fermin*, 93 F. Supp. 3d at 49 (quoting *Gortat v. Capala Bros.*, 949 F. Supp. 2d 374, 386 (E.D.N.Y. 2013)).

In this case, the midpoint of Plaintiffs' claims is May 26, 2017, which is the midpoint between the earliest claims accrued within the statute of limitations (May 26, 2014) and the filing of the Complaint (May 26, 2020). Therefore, Plaintiffs should receive pre-judgment interest of nine percent per day on their minimum wage, overtime, and spread of hours damages from May 26, 2017 until the date of judgment.

## VII.   Post-judgment Interest

Plaintiffs seek, and are entitled to, post-judgment interest as of right.  *See* 28 U.S.C. § 1961. "The very language of 28 U.S.C. § 1961 ensures that an award of post-judgment interest is mandatory in any civil case where money damages are recovered."  *Duffy v. Oyster Bay Indus.*,

*Inc.*, No. 10-CV-3205 (ADS) (ETB), 2011 WL 2259798, at *3 (E.D.N.Y. Mar. 29, 2011), *report and recommendation adopted*, 2011 WL 2259749 (E.D.N.Y. June 2, 2011); *see generally Begum v. Ariba Disc., Inc.*, No. 12-CV-6620 (DLC), 2015 WL 223780, at *8 (S.D.N.Y. Jan. 16, 2015) (awarding post-judgment interest in a FLSA and NYLL wage-and-hour case).

Therefore, Plaintiffs should receive post-judgment interest, to be calculated from the date the Clerk of Court enters judgment in this action until the date of payment, using the federal rate set forth in 28 U.S.C. § 1961. *See Fermin*, 93 F. Supp. 3d at 52.

## CONCLUSION

Accordingly, for the reasons set forth above, the Court respectfully recommends that Plaintiffs' motion for default judgment be granted in part and denied in part. As noted above and in Appendix A, this Court respectfully recommends that Plaintiffs be awarded a total of **$3,908,095.24** in damages, consisting of **$224,428.32** for payments less than minimum wage; **$43,471.58** for wage payments that Plaintiffs never received at the end of their employment; **$955,311.80** for unpaid overtime wages; **$63,345.38** for spread-of-hour damages; **$2,573,114.16** in liquidated damages; **$48,024.00** in attorneys' fees; **$400.00** in costs; and pre- and post-judgment interest.

A copy of this Report and Recommendation is being electronically served on counsel. This Court directs Plaintiff's counsel to serve a copy of this Report and Recommendation by overnight mail and first-class mail to Defendants and to file proof of service on ECF by February 20, 2024. Copies shall be served at the following addresses:

| | |
|---|---|
| Flushing Paris Wedding | 42-55 Main Street, Flushing, New York 11355 |
| Paris Wedding Center | 42-55 Main Street, Flushing, New York 11355 |
| Wedding in Paris | 4711 8th Avenue, Units 1A, 1B, Brooklyn, New York 11220 |
| Laffection Wedding | 35-56 Main Street, Flushing, New York 11356 |
| Romantic Paris | 35 East Broadway, 1st Floor, New York 10002 |

Any objections to this Report and Recommendation must be filed within 14 days after service of this Report and Recommendation.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  *See also* Fed. R. Civ. P. 6(a) & (d) (addressing computation of days).  Any requests for an extension of time for filing objections must be directed to Judge Kovner.  Failure to file objections within this period designating the particular issues to be reviewed waives the right to appeal the district court's order.  *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010); *Kotlyarsky v. United States Dep't of Just.*, No. 22-2750, 2023 WL 7648618 (2d Cir. Nov. 15, 2023); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

SO ORDERED.

Dated:          Brooklyn, New York
                February 18, 2024

                                          */s/ Joseph A. Marutollo*
                                          JOSEPH A. MARUTOLLO
                                          United States Magistrate Judge